NOTICE:  All slip opinions and orders are subject to formal revision
and are superseded by the advance sheets and bound volumes of the
Official Reports.  If you find a typographical error or other formal
error, please notify the Reporter of Decisions, Supreme Judicial
Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston,
MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-11391

CAROLYN ZALESKI  vs.  STEPHEN ZALESKI.


Essex.     December 3, 2013. - August 1, 2014.

Present:  Ireland, C.J., Spina, Cordy, Botsford, Gants, Duffly, &
Lenk, JJ.[1]


Divorce and Separation, Alimony, Division of property.


Complaint for divorce filed in the Essex Division of the Probate
and Family Court Department on December 20, 2010.

The case was heard by Amy Lyn Blake, J.

The Supreme Judicial Court on its own initiative transferred
the case from the Appeals Court.


Paul P. Perocchi (Cynthia Grover Hastings with him) for the
wife.
David E. Cherny (Catharine V. Blake with him) for the husband.


DUFFLY, J.  The Alimony Reform Act of 2011, St. 2011, c. 124

(alimony reform act or act), changed the legal framework under which

courts may award alimony when a marriage ends in divorce.  The act

_____

[1] Chief Justice Ireland participated in the deliberation on this
case prior to his retirement.

created four categories of alimony: "[g]eneral term alimony," "[r]ehabilitative alimony," "[r]eimbursement alimony," and "[t]ransitional alimony," and placed durational limits on the length of time alimony may be paid absent specific extenuating circumstances as found by a judge before the statutory period expires. See G. L. c. 208, §§ 48-52. We are asked to decide in this case of first impression whether a Probate and Family Court judge abused her discretion in determining that rehabilitative alimony, with its presumptive five-year payment period, was the appropriate form of alimony to be ordered, rather than general term alimony, which, based on the length of the parties' marriage, would have permitted alimony payments to continue for thirteen years.

In December, 2010, Carolyn Zaleski (wife) filed a complaint for divorce from Stephen Zaleski (husband) on the ground of an irretrievable breakdown of the marriage. Following trial, judgment entered granting a divorce nisi on the basis of irretrievable breakdown of the marriage, see G. L. c. 208, § 1B, awarding rehabilitative alimony to the wife, dividing the marital assets, and incorporating a stipulation of the parties regarding the custody and education of their two children. The wife appealed, and we transferred the case to this court on our own motion.

The wife challenges that portion of the judgment ordering the husband to pay rehabilitative alimony rather than general term

alimony.   She also challenges the judge's exclusion of the husband's bonus income from the calculation of the amount of the alimony award; the requirement that she maintain policies of term and whole life insurance as security for her obligations under the divorce judgment; and the division of marital assets, including the allocation of marital debt.   We conclude that it was not an abuse of discretion to award rehabilitative alimony, and that the allocation of debt and division of property between the parties was warranted by the evidence.   Nonetheless, we remand for further proceedings based on our determination that it was error not to include all of the husband's income in the calculation of the amount of alimony, and that there was no basis in the judge's findings to require the wife to maintain life insurance policies as security.

Background.   We draw our summary of the facts from the judge's written findings of fact.   The parties were married on October 15, 1994, in Massachusetts.   At the time of trial, the wife was forty-five years old and the husband was forty-eight years old.[2] They have two children, both of whom attend private schools; at the time of trial, their daughter was a sophomore in high school and their son was in the eighth grade.   The parties are in agreement that their son should also attend a private high school.   In June, 2011, the

---

[2] The trial took place over three nonconsecutive days from January 31, 2012, to March 6, 2012.

parties agreed to a temporary parenting arrangement under which the children resided in the marital home continuously and the parties moved in and out of the marital residence to accommodate each party's scheduled time with the children.[3]  The complaint for divorce was served on the husband in February, 2011.[4]

The judgment of divorce ordered the husband to pay the wife rehabilitative alimony in the amount of $11,667 per month for five years; this amount is thirty-five per cent of the husband's annual base salary of $400,000.[5]  A stipulation of the parties that provided for shared legal and physical custody of the children was

---

[3] Pursuant to this "nesting arrangement," as described by the parties, when a party was not residing in the marital home with the children, that party lived in a shared apartment that was maintained by the parties for this purpose.

[4] This was a marriage of approximately sixteen years and four months under the definition of "[l]ength of marriage" in G. L. c. 208, § 48 (defining "length of marriage" as "the number of months from the date of legal marriage to the date of service of a complaint . . . for divorce").

[5] Alimony was to be paid by the husband in monthly instalments commencing on July 1, 2012, and terminating on the earliest of July 1, 2017, the remarriage of the wife, or the death of either party. For State and Federal income tax purposes, the alimony payments were deductible by the husband, and included as taxable income to the wife. See Holmes v. Holmes, 467 Mass. 653, 655 n.2 (2014).  The husband was ordered to maintain his then-current medical, dental, and vision insurance for the benefit of the children until their emancipation, and for the wife so long as she was eligible for coverage under the terms of his employer-sponsored insurance coverage.  In the event of an additional cost to the husband to insure the wife, the wife was to be responsible for such cost.  Each party was responsible for his or her own uninsured medical and dental expenses.

incorporated in the judgment; the judge ordered that neither was to pay child support "at this time."  The judgment further provided that the husband shall be solely responsible for the children's private school tuition and expenses, and that the parties shall share equally the cost of the children's extracurricular and enrichment activities and their uninsured medical and dental costs.[6]  In addition, the judgment required both parties to maintain life insurance coverage as it existed at the time of trial as security for their obligations; allocated responsibility for certain joint indebtedness; ordered that each party will have responsibility for liabilities standing in his or her own name; and provided for a division of assets, including a payment from the husband to the wife in the amount of $27,466, "[i]n order to equalize the division."[7]

Discussion.  1.  Statutory framework.  Because there was no alimony jurisdiction at common law, "the power to grant alimony was

---

[6] No provision was made for payment of the children's future college tuition and expenses.  See Passemato v. Passemato, 427 Mass. 52, 54 (1998) ("as a general rule, support orders regarding the future payment of post-high school educational costs are premature and should not be made").

[7] The judgment ordered that the wife transfer her interest in the marital home to the husband, and required that the husband refinance the existing mortgage and pay to the wife the sum of $161,432, an amount equal to one-half of the equity in the home.  The judgment also ordered that certain bank accounts, investment accounts, and retirement accounts standing in the individual name of a party would remain that party's property.  The husband's Merrill Lynch 401(k) account and Fidelity Investments individual retirement account were to be divided equally.

wholly statutory."  Gottsegen v. Gottsegen, 397 Mass. 617, 621-624

(1986).[8]  The courts' authority to grant alimony has been set forth

in G. L. c. 208, § 34.  As noted, the alimony reform act of 2011 added

new provisions to c. 208, creating four categories of alimony; only

rehabilitative and general term alimony are at issue here.[9]  Both

require that a judge consider the factors set forth in G. L. c. 208,

---

[8] The courts' statutory authority to award alimony has existed
in the Commonwealth since 1786.  See St 1785, c. 69.

[9] The other two forms of alimony are reimbursement and
transitional alimony.  Reimbursement alimony is defined as

"the periodic or one-time payment of support to a recipient
spouse after a marriage of not more than [five] years to
compensate the recipient spouse for economic or noneconomic
contribution to the financial resources of the payor spouse,
such as enabling the payor spouse to complete an education or
job training."

G. L. c. 208, § 48.  Reimbursement alimony terminates on the death
of the recipient or on a date certain; once ordered, modification
of reimbursement alimony is prohibited and income guidelines,
applicable to all other forms of alimony, do not apply.  G. L.
c. 208, § 51 (a)-(c).

Transitional alimony is defined as:

"the periodic or one-time payment of support to a recipient
spouse after a marriage of not more than [five] years to
transition the recipient spouse to an adjusted lifestyle or
location as a result of the divorce."

G. L. c. 208, § 48.  Transitional alimony terminates on the death
of the recipient or a date certain "that is not longer than [three]
years from the date of the parties' divorce."  G. L. c. 208, § 52.
The statute prohibits modification or extension of transitional
alimony, which, once ordered, may not be replaced with another form
of alimony.  Id.

§ 53, in deciding the appropriate form of alimony:

> "the length of the marriage; age of the parties; health of the parties; income, employment and employability of both parties, including employability through reasonable diligence and additional training, if necessary; economic and non-economic contribution of both parties to the marriage; marital lifestyle; ability of each party to maintain the marital lifestyle; lost economic opportunity as a result of the marriage; and such other factors as the court considers relevant and material."

G. L. c. 208, § 53 (a).  These factors also are to be considered in determining the amount of alimony to be awarded.  Id.  In sum, the primary differences between rehabilitative and general alimony relate to the initial term limits set forth in the act and the standard by which the term of alimony may be extended.

Rehabilitative alimony is defined as "the periodic payment of support to a recipient spouse who is expected to become economically self-sufficient by a predicted time, such as, without limitation, reemployment; completion of job training; or receipt of a sum due from the payor spouse under a judgment."  G. L. c. 208, § 48.  The alimony reform act provides, among other things, that "[r]ehabilitative alimony shall terminate upon . . . the occurrence of a specific event in the future," G. L. c. 208, § 50 (a),[10] but also

---

[10] General Laws c. 208, § 50 (a), provides in full:

"Rehabilitative alimony shall terminate upon the remarriage of the recipient, the occurrence of a specific event in the future or the death of either spouse; provided, however, that the court may require the payor to provide reasonable security for payment of sums due to

that the alimony term shall not exceed five years. G. L. c. 208, § 50 (b). Extension of the term is authorized, however, on a showing of compelling circumstances that "unforeseen events prevent the recipient spouse from being self-supporting at the end of the term with due consideration to the length of the marriage, [and] the court finds that the recipient tried to become self-supporting." G. L. c. 208, § 50 (b).[11] The amount of alimony may be modified during the term "upon material change of circumstance." G. L. c. 208, § 50 (c). By contrast, general term alimony is defined as "the periodic payment of support to a recipient spouse who is economically dependent." G. L. c. 208, § 48. Payments continue, subject to durational time limits established by the act that depend upon the length of the marriage; here, general alimony would have entitled the wife to support payments of up to approximately thirteen years.[12]

---

the recipient in the event of the payor's death during the alimony term."

[11] General Laws c. 208, 50 (b), provides:

"The alimony term for rehabilitative alimony shall be not more than [five] years. Unless the recipient has remarried, the rehabilitative alimony may be extended on a complaint for modification upon a showing of compelling circumstances in the event that: (1) unforeseen events prevent the recipient spouse from being self-supporting at the end of the term with due consideration to the length of the marriage; (2) the court finds that the recipient tried to become self-supporting; and (3) the payor is able to pay without undue burden."

[12] Because this was a marriage of approximately sixteen years

See G. L. c. 208, § 49.  General term alimony can be extended for "good cause" if there has been a material change in circumstances and the reasons are supported by "clear and convincing evidence." G. L. c. 208, § 49 (f) (2).

We turn to a consideration whether the judge's findings in this case reflect that she considered the mandatory factors when determining the appropriate form of alimony, and whether those findings support her conclusion that the wife should receive rehabilitative alimony.  We then consider whether the findings support the judge's determination regarding the amount of the alimony award.

2.  Standard of review.  A judge has broad discretion when awarding alimony under the statute.  Heins v. Ledis, 422 Mass. 477, 480-481 (1996).[13]  In reviewing both the form and the amount of an

___

and four months, see note 4, supra, the durational period of general term alimony is governed by G. L. c. 208, § 49 (b) (4), which provides:

> "If the length of the marriage is [twenty] years or less, but more than [fifteen] years, general term alimony shall continue for not longer than [eighty] per cent of the number of months of the marriage."

[13] The legislative history clearly shows that the broad discretion judges historically have had in making awards of alimony was not affected by the Alimony Reform Act of 2011, St. 2011, c. 124 (alimony reform act).  Indeed, the Legislature appears to have viewed the creation of the four categories of alimony as providing greater discretion to judges.   A senator speaking in support of the bill that would become the alimony reform act stated, "Under this bill, people are provided with the ability to plan for their future.

award of alimony, we examine a judge's findings to determine whether the judge considered all of the relevant factors under G. L. c. 208, § 53 (a), and whether the judge relied on any irrelevant factors. Cf. Baccanti v. Morton, 434 Mass. 787, 790 (2001) (reviewing factors under G. L. c. 208, § 34, regarding division of marital property). "[I]t is important that the record indicate clearly that the judge considered all the mandatory statutory factors," Rice v. Rice, 372 Mass. 398, 401 (1977), and that the reason for her conclusion is apparent in her findings. Heins v. Ledis, supra at 481. "A judgment will not be disturbed on appeal unless "plainly wrong and excessive." Id., quoting Pare v. Pare, 409 Mass. 292, 296 (1991).

3. Rehabilitative alimony. a. Mandatory factors. A judge has discretion in deciding whether to award rehabilitative alimony rather than general term alimony, so long as she has given appropriate

---

They are provided with clear guidance. We still need discretion for judges." See State House News Service (Senate Sess.), July 28, 2011 (statement by Senator Cynthia S. Cream). And in floor debates prior to adoption of the alimony reform act, a representative stated, "We create[d] several forms of alimony. . . . [The bill] gives judges the ability to do things they can't do now." See State House News Service (House Sess.), July 20, 2011 (statement by Representative John V. Fernandes prior to vote to engross 2011 Senate Doc. No. 665). See also State House News Service, Sept. 25, 2011 ("The bill lays out for the first time in state law specific guidelines on the levels and duration, amount and form of payments to former spouses. Reform advocates say the bill will give judges more discretion on when and how much alimony to award").

consideration to the factors identified in G. L. c. 208, § 53 (a).[14] Where the determination is made that rehabilitative alimony, with its shorter durational limits, is the most appropriate form, findings based on those factors must support the conclusion that a recipient spouse's economic dependence is temporary, and that, at a predictable date, the dependent spouse can become self-sufficient by undertaking reasonable efforts.  See G. L. c. 208, §§ 48, 53.

Here, the judge made comprehensive findings of fact in conjunction with her conclusion that the appropriate form of alimony in this case was rehabilitative.  "[W]e will not reverse findings made by the judge on the basis of oral testimony unless we are convinced they are plainly wrong."  Felton v. Felton, 383 Mass. 232, 239 (1981).  See Mass. R. Dom. Rel. P. 52 (a).  According to those findings, this was a marriage of approximately sixteen years and four months; at the time of trial the wife was forty-five years old and the husband was forty-eight years old; both parties enjoyed good health, as did their children.  During most of the marriage, both parties were employed full time outside the home and contributed their earnings to the marital enterprise.  The marriage was a "true partnership in every aspect," from the financial contributions that

---

[14] There is nothing in the statutory scheme to suggest that, even where there is evidence of conditions supporting rehabilitative alimony, a judge must in every case award rehabilitative and not general term alimony; indeed, a fine line may distinguish the two in some circumstances.

each made "to child rearing[, and] to homemaking."

The husband, who holds a bachelor of arts degree in political science, initially worked as a real estate appraiser, then as an analyst and executive in real estate investment firms. The husband's income, as reported on his Internal Revenue Service W-2 forms, was $302,442 in 2004. It increased annually until it reached $1,024,555 in 2008, and was in excess of $900,000 in 2009 and 2010. In 2011, the husband's income as reported on his W-2 forms was $741,958.[15] Since 2008, the husband's income has consisted of base salary in the amount of approximately $400,000, and bonuses which are paid annually in the year after they are earned. In 2011, the husband also received $286,625 in nonrecurring deferred compensation from a prior employer. The husband's income during the marriage was always greater than that of the wife. The husband was found to be self-supporting and fully employed commensurate with his training, skills, and experience.

The wife holds a bachelor of science degree in business; beginning early in the marriage, she was employed as a sales

---

[15] According to the judge's findings, the husband "received" bonuses from his present employer in the amount of $200,000 in 2008, $200,000 in 2009, and $345,000 in 2010, but the uncontested trial evidence reflects that those amounts were "earned" in the years indicated and received a year later and that the husband's income for 2011 included a bonus in the amount of $345,000, and in each of 2010, 2009, and 2008 his income included a bonus of $200,000. This evidence is consistent with the judge's findings regarding the husband's 2011 income.

representative and, starting in 1990, as a pharmaceutical sales representative for several companies. In 2003, the wife was promoted to the position of sales district manager, a job from which she was terminated in 2007. See note 16, infra. At that time, her base salary was in the range of $127,000 to $130,000 annually, with a bonus of up to $40,000; she also had use of the company car.

The judge found that the wife, who has not been employed outside the home since 2008, is not presently self-supporting, but has the ability and the desire to work. The judge found credible the wife's testimony that she wants to work and plans to work outside the home, but found also that her job search efforts have been sporadic and superficial, and that she had not used her best efforts to secure employment.[16] At the time of trial, the wife had received no interview or job offers as a result of her job search. The judge was not required to credit, or to give significant weight to, the wife's assertions as to those steps she had taken in her job search, which do not, even if credited, negate the finding that the wife had not used her best efforts. Cf. Flaherty v. Flaherty, 40 Mass. App. Ct. 289, 291 (1996). The judge did not credit the opinion of the

---

[16] The judge found that, immediately after being terminated from her job in 2007, the wife applied for a job with another company, but received no response. Soon thereafter, the wife and her sister-in-law started a consulting firm for early-stage pharmaceutical companies, but the business closed after six months because of what the judge described as "issues" in the sister-in-law's life.

husband's expert that the wife was highly employable as a sales manager or marketing manager and in those jobs could earn an annual salary of $160,000 to $170,000, but did find that the wife had skills that were transferrable across many fields beyond pharmaceutical and medical device sales.

Also according to the findings, "[t]he parties lived an upper middle class lifestyle during the marriage. They dined out, vacationed, joined a yacht club," and owned boats, luxury vehicles, and a second home, which the parties sold by agreement during the litigation. The children attended private schools. The husband held membership in a fish and game club, while the wife was a member of a tennis club. The judge also found that the husband and wife "spent beyond their means" and that, despite the husband's significant income and the wife's "meaningful salary," their only assets at the time of trial consisted of the equity in their home and their retirement accounts.

The judge determined that the wife was in need of rehabilitative alimony and that it was "anticipated that [the w]ife will return to the workforce on a full time basis" within a predictable period of time, and that until such time she "is in need of alimony." The judge further found that, with reasonable effort, the wife "can be employed within five years. At such time, the parties will need to review each of their respective financial circumstances and the need for

continued alimony and/or child support."

These factors reflect that the judge gave consideration to all the factors identified in G. L. c. 208, § 53 (a). We turn now to the wife's claim that the findings do not support the judge's determination that the wife will become self-sufficient by a predictable date in the future.

b. Self-sufficiency by predicted date. The wife argues that the judge abused her discretion in awarding rehabilitative rather then general term alimony, because there is no specific event upon which termination was based. The wife relies on the language in G. L. c. 208, § 50 (a), which provides, in relevant part, that "[r]ehabilitative alimony shall terminate upon . . . the occurrence of a specific event in the future," to support her claim that rehabilitative alimony is appropriate only where a judge has identified a "specific event in the future," such as completion of job training or a medical residency, passing a licensing examination, or graduation from a specific educational program. We agree that the examples provided by the wife can support the award of rehabilitative alimony. However, we conclude that, in some circumstances, the potential of future reemployment may provide a basis for deciding that rehabilitative, rather than general term, alimony should be awarded.

We interpret a statute according to "all its words construed

by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." Board of Educ. v. Assessor of Worcester, 368 Mass. 511, 513 (1975), quoting Industrial Fin. Corp. v. State Tax Comm'n, 367 Mass. 360, 364 (1975). The reference to a "specific event" is found only in G. L. c. 208, § 50 (a), which establishes the durational limits for rehabilitative alimony. The meaning of "specific event" must be considered in light of other provisions in the alimony reform act that define rehabilitative alimony and list the factors a judge must consider when determining the form of the alimony award.

General Laws c. 208, § 48, defines rehabilitative alimony as support paid to "a recipient spouse who is expected to become economically self-sufficient by a predicted time, such as, without limitation, reemployment; completion of job training; or receipt of a sum due from the payor spouse under a judgment." Although the wife makes no direct reference to this provision, it is implicit in her argument that she views the term "reemployment" to mean a specific, identifiable job that is expected to materialize on a date certain. But future employment is also among the factors a judge must consider in determining the form of alimony to be awarded.

As set forth in G. L. c. 208, § 53 (a), a judge must consider

the "employment and employability of both parties, including employability through reasonable diligence and additional training, if necessary."  "Employable" has been defined as "capable of being employed," Webster's Ninth New Collegiate Dictionary 408 (1991), and "able to be employed," Webster's New Universal Unabridged Dictionary 638 (2003).  "Employability" in this context means that a party has the capability of being employed.  As the act suggests, to become employable may require that a party undertake "reasonable diligence and additional training."  Thus, although a party may not be employed or employable at the time of entry of the alimony award, that party still could have predictable prospects of future employment in a specific type of work or position.  In such circumstances, if a party's employability in the near future is a realistic prospect, rehabilitative alimony might, with other considerations, be appropriate.

The act itself sheds no further light on the specific circumstances in which a spouse might be deemed capable of economic independence at some predictable date that is five years or less in the future.  Our decisional law, however, through which the concept of rehabilitative alimony has developed, provides some guidance. The purpose of an award of rehabilitative alimony is "to protect, for a limited time, a spouse whose earning capacity has suffered (or become nonexistent) while that spouse prepares to reenter the work

force." <u>Moriarty</u> v. <u>Stone</u>, 41 Mass. App. Ct. 151, 158 (1996), quoting <u>Bak</u> v. <u>Bak</u>, 24 Mass. App. Ct. 608, 621-622 (1987). See <u>Fechtor</u> v. <u>Fechtor</u>, 26 Mass. App. Ct. 859, 867-868 (1989) (affirming award rehabilitative alimony to "knowledgeable, experienced businesswoman" who "may take some time" to reach level of earnings she previously had achieved while employed at husband's business). The award of rehabilitative alimony is appropriate when a spouse's anticipated self-sufficiency is based on the predictable occurrence of a future event, such as reemployment. <u>Adlakha</u> v. <u>Adlakha</u>, 65 Mass. App. Ct. 860, 870 (2006).[17] In accordance with these cases, the prospect of future employment, when based on a past history of commensurate employment followed by a brief hiatus, may be sufficiently predictable, even in the absence of an available, specifically identifiable job.

Rehabilitative alimony is the appropriate form of alimony if "a recipient spouse . . . is expected to become economically self-sufficient by a predicted time." G. L. c. 208, § 48. Thus,

---

[17] See <u>Sampson</u> v. <u>Sampson</u>, 62 Mass. App. Ct. 366, 371 (2004) (durational limit not warranted where "simply uncertain" that wife, sole proprietor of small business, could generate future income that would render alimony unnecessary); <u>D.L.</u> v. <u>G.L.</u>, 61 Mass. App. Ct. 488, 510 (2004) (durational limit not warranted where "simply uncertain" whether wife's future income from employment would render alimony unnecessary); <u>Goldman</u> v. <u>Goldman</u>, 28 Mass. App. Ct. 603, 613 (1990) ("Where future events cannot be predicted with any measure of certainty, an alimony award should be based on present conditions").

the alimony reform act permits a judge to determine that rehabilitative alimony based on expected employment is appropriate where there is sufficient evidence for a judge to find, with a reasonable degree of certainty, that the recipient spouse can obtain employment through reasonable efforts, and thereby can gain economic self-sufficiency, in the near future.  See G. L. c. 208, § 50 (b).

Here, the judge found that both parties are educated professionals, experienced in their respective fields.  The wife had been employed outside the home until 2008, fewer than four years before the end of the marriage; at that time, her income was approximately $170,000.  After losing her job, the wife pursued her interest in interior design, attending classes in 2009 and 2010, and started a business that failed through no fault of her own.  The judge found also that the wife wished to work, that she was highly employable in the area of sales, that her skills were transferrable, and that she could with reasonable diligence find employment at a level permitting self-sufficiency.  These findings support the judge's determination that the wife can be "expected to become economically self-sufficient by a predicted time."  G. L. c. 208, § 48.  Thus, the judge did not abuse her discretion in deciding that the wife was not entitled to general term alimony under the specific

facts of this case.[18]  See Heins v. Ledis, 422 Mass. 477, 480-481 (1996).

4.  Amount of alimony award.  The wife also challenges the amount of the alimony award, arguing that it should not have been calculated solely from the husband's base salary, but rather should have encompassed his income from all sources, including any bonuses. The husband argues that alimony based on thirty-five per cent of his base income is sufficient to meet the wife's needs; that any future bonuses are the result of his own hard work alone; that the amount of his future bonuses is speculative; and that by ordering him to pay all of the cost of the children's private school education, the judge was in essence excluding from his income an amount that the judge had already considered for setting a child support order, as provided by G. L. c. 208, § 53 (c) (2).

Included among the factors that the judge was required to consider in determining the amount of the alimony award are "marital lifestyle" and "ability of each party to maintain the marital

_____

[18] As to the circumstances of the wife's departure from her last position, the judge found that the wife's employer had determined after investigation that, as a sales district manager, she had approved an expense of a sales representative who had misappropriated the funds.  The wife had no knowledge of this misappropriation, but was fired nonetheless.  However, as the judge noted in her findings, the husband's expert was not asked what impact the involuntary departure from employment would have on the likelihood of the wife's ability to secure employment.  The wife introduced no expert testimony on this issue.

lifestyle." G. L. c. 208, § 53 (a). In addition, an award of rehabilitative alimony is governed by the general guidelines for awards of alimony, other than reimbursement alimony, that the amount "should generally not exceed the recipient's need or [thirty] to [thirty-five] per cent of the difference between the parties' gross incomes established at the time of the order being issued." G. L. c. 208, § 53 (b). Subject to certain exclusions,[19] "income shall be defined as set forth in the Massachusetts child support guidelines." G. L. c. 208, § 53 (b).

As the provisions of G. L. c. 208, § 53 (b), make clear, where an award of alimony is necessary to assure the "self-sufficiency" of a spouse who is determined to be dependent -- whether for the short or long term -- the award must reflect the parties' marital lifestyle. One method of measuring the amount necessary to support a spouse in a manner consistent with the marital lifestyle (particularly where, as here, the parties were found to be spending beyond their means) may be found in the provision that authorizes

---

[19] General Laws c. 208, § 53 (c), provides:

"When issuing an order for alimony, the court shall exclude from its income calculation:

"(1) capital gains income and dividend and interest income which derive from assets equitably divided between the parties under [§] 34; and

"(2) gross income which the court has already considered for setting a child support order."

an alimony award based on "need," or on a percentage of "the difference between the parties' gross incomes established at the time of the order being issued." G. L. c. 208, § 53 (b). Because "need" is a relative term for purposes of the act, it must be measured in light of mandatory considerations that include the parties' marital lifestyle. The judge found that the parties enjoyed "an upper middle class lifestyle" that included dining out, vacations, memberships in clubs, luxury automobiles, boats, and private schools for their children. Although the husband's income at times prior to the divorce approached or exceeded $1 million annually, the husband and wife "spent beyond their means" and acquired few assets. On these facts, the judge did not abuse her discretion in arriving at an award based on thirty-five per cent of the husband's income, rather than on a calculation of need based on historic marital spending. Cf. M.C. v. T.K., 463 Mass. 226, 234 n.11 (2012) (noting distinction between net worth and standard of living, and that household spending is but one mode of establishing standard of living).

The question remains whether the judge was required to include the husband's bonus income in this calculation. The language of the act is clear that all of the payor spouse's income, as defined by the Massachusetts Child Support Guidelines (guidelines), must be included in any calculation of alimony, and bonus income is

specifically included in this definition.[20] Caring for dependent children is a factor to be considered in awarding child support, but is not among the factors to be considered in determining alimony. See G. L. c. 208, § 53 (a). See also Saia v. Saia, 58 Mass. App. Ct. 135, 137-138 (2003).

It is certainly possible, as the husband suggests, that the judge factored in as child support an amount the wife might otherwise have been ordered to contribute to the costs of the children's private schools, but the findings on this point are not clear. The judge found that "the parties agreed that neither would pay child support to the other," and, on this basis, ordered that neither party was to pay child support "at this time." However, the record supports the wife's claim that there was no agreement that the husband need not pay child support. Rather, at trial the wife sought child support calculated in accordance with applicable provisions in the guidelines, and proposed that the amount so calculated would be "designated . . . as alimony," so that the husband could enjoy the

---

[20] The definition of income in the Massachusetts Child Support Guidelines (effective Jan. 1, 2009) (guidelines) that were in effect at the time of the trial in this case is very broad and includes bonuses among twenty-seven specifically identified sources of income, as well as "any other form of income or compensation not specifically itemized above." The guidelines in effect as of August 1, 2013, do not alter this aspect of the definition of income.

tax advantages that such a designation would provide.[21] She thereafter sought to amend the judgment, seeking, among other things, an increase in the alimony award by a percentage of the husband's income in excess of his base salary.[22]

Because the alimony amount was not calculated on the basis of all of the husband's income, as required by the statute, and because the finding that the wife agreed that the husband need not pay child support was erroneous, we are unable to conclude that the amount of alimony was determined after due consideration of all of the statutory factors. We therefore remand to the Probate and Family Court for recalculation of the amount of alimony, and for any additional action that the judge may deem to be warranted.

5. <u>Life insurance as security</u>. The judgment ordered both parties to maintain the life insurance policies in effect at the time of trial for the benefit of the other. The act authorizes a court

---

[21] Section II.A of the guidelines provides that the guidelines "do not preclude the Court from deciding that any order be designated in whole or in part as alimony." Further, § II.A of the 2013 guidelines provides that, consistent with the alimony reform act,

> "[c]onsideration may be given by the parties to preparing alternative calculations of alimony and child support to determine the most equitable result for the child and the parties. Depending upon the circumstance, alimony may be calculated first, and in other circumstances child support will be calculated first. Judicial discretion is necessary and deviations should be considered."

[22] We do not suggest that the amounts calculated by the wife are correct.

to "require reasonable security for alimony in the event of the payor's death during the alimony period.  Security may include, but shall not be limited to, maintenance of life insurance."  G. L. c. 208, § 55 (a).  In addition, when support for children has been ordered, "the court may require sufficient security for its payment according to the judgment."  G. L. c. 208, § 36.

The wife's insurance policies would provide a death benefit to the husband in the amount of $1.6 million; at the same time, the husband would be relieved of his obligation to pay alimony.[23]  See G. L. c. 208, § 50 (a).  Although the wife is responsible for one-half of the cost of the children's extracurricular and enrichment activities and one-half of their uninsured medical and dental costs, nothing in the judge's findings suggests that these costs were the basis for her order.  The findings do not otherwise support an order requiring security under G. L. c. 208, § 55 (a), or under G. L. c. 208, § 36.  Assuming that some security could be found to be appropriate, the amount of the death benefit the wife was ordered to maintain exceeds any financial obligation she has under the judgment and, on this basis, the order requiring that the wife maintain life insurance policies with a death benefit of $1.6 million for the benefit of the husband was an abuse of discretion.

----

[23] The parties are in agreement that the wife's annual premiums for the policies she has been ordered to maintain total approximately $15,561.

6. Division of assets. The wife contends that the judge's assignment of marital property and allocation of responsibility for the parties' liabilities was plainly wrong and not supported by the judge's findings. She argues that, because the judge found the marriage to be a "true partnership" and ordered a payment to "equalize the division of assets," the judge intended to effect an approximately equal division of assets. The wife contends that the division was not equal, because the judge allocated to her a greater amount of debt than was allocated to the husband, failed to value certain of the husband's bank accounts, and incorrectly divided one asset based on its present value rather than ordering that she receive one-half of any future proceeds.

We review the judge's findings to determine whether she considered all the relevant factors under G. L. c. 208, § 34, and whether she relied on any irrelevant factors. See Baccanti v. Morton, 434 Mass. 787, 790 (2001). "We will not reverse a judgment with respect to property division unless it is 'plainly wrong and excessive.'" Id. at 793, quoting Mahoney v. Mahoney, 425 Mass. 441, 447 (1997).

The judgment allocates debts totaling $75,519.04 to the wife and $26,200.71 to the husband. The findings reflect that over $16,000 of the wife's listed debts were to repay loans from members of her family, and over $57,000 consisted of credit card debt incurred

by the wife alone. The judge found that the wife's credit card charges reflect a lifestyle beyond that which the wife could afford; because the debts were incurred at a time when the husband "was paying all of the family's living expenses" and the wife was receiving weekly cash payments from the husband, who had taken over management of the family finances, the judge found that the debts were solely those of the wife. The judge's findings are supported by the evidence, and the allocation of liabilities was not plainly wrong or excessive.

Apart from this allocation of the parties' liabilities, the judge awarded each party assets of roughly equal value. The judge was not required to follow a precise mathematical formula in dividing the marital estate. See Williams v. Massa, 431 Mass. 619, 631 (2000); Denninger v. Denninger, 34 Mass. App. Ct. 429, 430 (1993). The wife claims that the judge erred in concluding that the value of the husband's bank accounts was "nominal." The husband testified at trial that the balances in these accounts had changed; he was using them to pay bills, and had recently made a mortgage payment on the former marital residence.[24] The judge was entitled to, and implicitly did, credit this testimony when she allocated these accounts to the husband without an attribution of specific value. The wife also takes issue with the manner in which the judge divided

_____

[24] The husband's financial statement sets forth weekly living expenses of $7,250.61, including payments to the wife in the amount of $500.

the interests in a particular investment vehicle. The judge found that the present value of the husband's interest in that investment vehicle was $24,625. One-half of the value of the investment vehicle was assigned to the wife. The wife makes no claim that the finding as to the present value of this asset is erroneous.[25] Rather, she argues that the asset should have been divided on an "if, as, and when basis," meaning that she should receive one-half of the value at some future date if, and when, investors receive a return on their investment.

Because the wife does not challenge the judge's finding as to the present value of this investment, and the parties have sufficient assets to permit a present payment, it was not an abuse of the judge's discretion to order present assignment of the wife's interest. See, e.g., Dewan v. Dewan, 399 Mass. 754, 757 (1987), citing Holbrook v. Holbrook, 103 Wis. 2d 327, 340 (Ct. App. 1981) (present assignment of percentage of future pension benefits is "the preferable approach" where sufficient assets are available at time of divorce to divide present value without causing undue hardship to either spouse).

Conclusion. For the foregoing reasons, the order in the

---

[25] The husband listed this as the value on his financial statement submitted to the court in conjunction with the divorce filing. The value reflects the cost of two subscription units of the investment vehicle made available through a private offering to employees of a certain investment firm, less an outstanding payment of $375.

judgment of divorce nisi requiring the plaintiff to maintain her current policies of life insurance for the benefit of the defendant is vacated.  The matter is remanded to the Probate and Family Court for recalculation of the amount of the monthly alimony payment to be made to the plaintiff in light of this opinion.  In all other respects, the judgment is affirmed.

<u>So ordered</u>.