APPEALS COURT 
 
 KARIM SUWWAN DE FELIPE vs. LEILA EL-YOUSSEF SUWWAN[1]

 
 Docket:
 24-P-792
 
 
 Dates:
 June 6, 2025 – October 14, 2025
 
 
 Present:
 Englander, Toone, & Wood, JJ.
 
 
 County:
 Suffolk
 

 
 Keywords:
 Divorce and Separation, Division of property, Alimony. Corporation, Close corporation, Valuation.
 
 

  
      Complaint for divorce filed in the Suffolk Division of the Probate and Family Court Department on September 24, 2020.
      The case was heard by Megan H. Christopher, J.
      Nancy F. Baskin (Jordana S. Kershner also present) for the husband.
      Stephen A. MacKenzie (Andrea Peraner-Sweet also present) for the wife.
      TOONE, J.  The husband, Karim Suwwan De Felipe, appeals from a judgment of divorce nisi.  He argues that the Probate and Family Court judge erred by failing to apply the modified time rule formula set forth in Baccanti v. Morton, 434 Mass. 787, 801 (2001), to closely held securities obtained in connection with his employment and ordering the distribution of those assets on an "if and when received" basis.  The husband also challenges the alimony award on several grounds.  We affirm.
      Background.  The parties married in 2006 and have one minor child.  The husband was hired by the Fidelity Research and Management Company, LLC (Fidelity), in 2015 and continues to work there as a research analyst and portfolio manager.  From 2016 to 2020, the wife, Leila El-Youssef, worked as an associate dentist.
      On September 24, 2020, the husband filed a complaint for divorce, alleging an irretrievable breakdown of the marriage pursuant to G. L. c. 208, § 1B.  On November 9, the wife filed an answer and counterclaim for divorce.  After a trial over multiple days in 2022 and 2023, the judge issued findings of fact and a rationale on April 12, 2024, and a judgment nisi entered four days later.
      The judgment provided for the equitable distribution of the marital assets, including several homes, cars, checking accounts, and a sailboat.  Most assets obtained in connection with the husband's employment at Fidelity, including his retiree health plan and brokerage and 401(k) accounts, were equally divided.  With respect to Fidelity's performance shares, an instrument that does not convey ownership or pay dividends, the judge awarded the husband all shares granted but not yet distributed.   The judge included the income that the husband received from those shares in determining his income for purposes of his child support and alimony obligations.
      The judgment also divided the husband's nonvoting common shares (NVCs) and investor entity units (IEUs).  As their name indicates, NVCs convey an ownership interest in Fidelity, but not the right to vote on the company's business decisions.  Fidelity allows only a small group of highly valued employees to purchase NVCs, and they must qualify as accredited investors under Security and Exchange Commission regulations.  In December 2020, three months after the husband filed his complaint for divorce, he became eligible for and purchased 20,000 NVCs (2020 NVCs) from Fidelity.  He purchased an additional 20,000 NVCs in December 2022 (2022 NVCs).  Because Fidelity is not a publicly traded company, there is no public share price for the NVCs.  Instead, Fidelity sets the net asset value (NAV) for the shares internally.  Fidelity provides eligible employees with a low-interest loan to purchase NVCs, and that loan is paid as the NVCs vest.  NVCs remain unvested for three years, and then vest at a rate of twenty percent per year for a period of five years.
      At the same time the husband purchased his first tranche of NVCs, he also purchased 575,000 IEUs (2020 IEUs), again assisted by a low-interest loan from Fidelity.  He purchased additional IEUs in 2022 (2022 IEUs).  IEUs are stocks in companies owned or partially owned by Fidelity.  Employees receive the opportunity to invest in IEUs when they purchase NVCs, and IEUs may also be distributed to NVC owners in lieu of or in addition to cash dividends.  IEUs pay intermittent dividends at the discretion of the individual companies, and those companies set their NAV.  While IEUs are fully vested when issued, they can be transferred only to authorized holders or assignees after the loan has been paid.
      In the judgment, the judge assigned the wife a fifty-percent interest in the 2020 NVCs and 2020 IEUs, as well as a fifty-percent responsibility for the outstanding loan balances associated with them.  The judge did not assign the wife any interest in the 2022 NVCs or 2022 IEUs.  With respect to the 2020 NVCs and 2020 IEUs, the judgment provided that if the husband cannot assign the wife's interests to her or to a trust for her benefit, he must hold them for her benefit "until such time as he leaves Fidelity or until the [w]ife directs the [h]usband to sell the shares on her behalf."  The judgment further required the husband to pay to the wife any dividends or distributions, net of any taxes owed, on the NVCs and IEUs held for her benefit.
      Discussion.  1.  Equitable distribution of the marital estate.  On appeal, the husband challenges the judge's equitable distribution of the 2020 NVCs and 2020 IEUs.  "The power to make an equitable division of the marital estate is entrusted to the judge's discretion, and we review the decision to ensure the judge properly relied on the statutory factors enumerated in G. L. c. 208, § 34."  Openshaw v. Openshaw, 493 Mass. 599, 613-614 (2024), citing Adams v. Adams, 459 Mass. 361, 371 (2011), S.C., 466 Mass. 1015 (2013).  We must determine "whether the reasons for the judge's conclusions are apparent in [her] findings and rulings" (quotation and citation omitted).  Adams, supra.  "We will not reverse a judgment with respect to property division unless it is plainly wrong and excessive" (quotation omitted).  Zaleski v. Zaleski, 469 Mass. 230, 245 (2014), quoting Baccanti, 434 Mass. at 793.
      a.  Assignment of the 2020 NVCs.  At the outset, we disagree with the husband's claim that the judge lacked "any cognizable basis" for assigning the wife a fifty-percent interest in the 2020 NVCs, but no interest in the 2022 NVCs.  The judge's findings and rulings find ample support in the record and reflect consideration of all the relevant factors under § 34.[2]  First, the judge found that the NVCs are a form of compensation that may be included in the marital estate.  See Adams, 459 Mass. at 373 (G. L. c. 208, § 34, allows for division of "all vested and nonvested benefits, rights and funds accrued during the marriage" [citation omitted]).  She rejected the husband's position that NVCs are only a retention tool; rather, NVCs serve as awards for past performance and allow, as Fidelity's controller testified, "the folks who are really helping Fidelity earn [its] money an opportunity to share in the assets of the firm."
      The judge further found that the husband received the opportunity to purchase the 2020 NVCs due to his employment at Fidelity during the marriage.  The opportunity is offered only to employees "who have demonstrated value to Fidelity and who have sufficient assets to be considered accredited investors," and even though the husband purchased the first tranche of NVCs in December 2020, after the parties' separation, "the efforts needed for [him] to be considered such a valuable employee were exerted during the marriage, and the assets required to be qualified as an accredited investor were acquired during and as a result of the marital partnership."  The judge distinguished the second tranche of NVCs purchased in December 2022 on the ground that "the timing of these purchases is sufficiently removed from the irretrievable breakdown of the marriage and the beginning of the divorce proceedings to suggest [that] the awards are the result of post-marital efforts."  Although this second opportunity to purchase NVCs also reflected, albeit to a lesser extent, efforts expended and assets acquired during the marital partnership, the judge's decision to "[b]alanc[e] the equities" by drawing a line between the 2020 and 2022 NVCs fell within the broad degree of discretion granted to her under § 34.  See Adams, 459 Mass. at 372-373.  "Mathematical precision is not required of equitable division of property," Fechtor v. Fechtor, 26 Mass. App. Ct. 859, 861 (1989), and "[t]here is no mathematical formula to determine what weight a judge should accord to any of the factors in § 34," Williams v. Massa, 431 Mass. 619, 631 (2000).
      The judge did not err by declining to apply the modified time rule formula outlined in Baccanti to determine which portion of the 2020 NVCs belong to the marital estate.  As the Supreme Judicial Court has explained, that formula is a way to take into account, for purposes of dividing property, "the fact that only one party may exert efforts after dissolution of the marriage to obtain the asset."  Baccanti, 434 Mass. at 799.  At trial, the husband presented expert testimony of an accountant who prepared a Baccanti analysis of the NVCs and "arrive[d] at an amount that would be divisible to the marital estate."  The judge acknowledged this testimony, but found "it appropriate for the Court, as the finder of fact, to determine whether the Baccanti formula applies in this case."  We agree.  Application of the formula, or some other method of apportionment, is required under Baccanti if "the judge determines that equity requires that the [assets] be apportioned."  Id. at 800.  The party challenging the inclusion of the assets in the marital estate must prove that they "were given for future services to be performed after dissolution of the marriage" and that "the non-employee spouse did not contribute to the employee spouse's ability to acquire" them.  Id.  Here, there really is not a serious question that at least a portion of the assets belong in the marital estate.  As the judge found, the husband earned both the opportunity to purchase the 2020 NVCs and the wealth needed to be an accredited investor "as a result of the marital partnership."  See id. at 803 ("the determinative factor" is whether assets "are attributable to the marital partnership").  The judge did not abuse her discretion in so finding.[3]  The only question, therefore, was not whether, but what proportion of the NVCs belonged in the marital estate.
      The husband's proposed application of the modified time rule formula would not have resulted in an equitable division of the 2020 NVCs, given the unique features of that financial instrument.  Baccanti focused on the distribution of stock options, which give "the employee the right to purchase the employer's stock at a predetermined price during a prescribed time period," but an employee "may never realize any value from them if their vesting is contingent on continued employment and the employee is no longer employed by the company."  Id. at 795.  "If the party with the burden of proof establishes that the [stock] options were given in whole or in part for future services to be performed after dissolution of the marriage, and the judge determines that equity requires that the options be apportioned," id. at 800, the judge may use the time rule formula (among other methods) to "calculate the portion of the options that properly may be included in the marital estate,"  id. at 800-801.  As modified by the Supreme Judicial Court, the time rule formula calculates the number of unvested stock options subject to division by multiplying the total by 
"a fraction whose numerator represents the length of time that the employee owned the options prior to dissolution of the marriage (i.e., the length of time that the employee owned the options prior to and during the marriage), and whose denominator represents the time between the date the options were issued and the date on which they are scheduled to vest."  
Id. at 801.  Applying that formula, and using the first day of trial as the date of division, the husband's accountant concluded that 12,616 of the 20,000 2020 NVCs were "unvested and therefore not subject to division."
      The Baccanti analysis advanced by the husband was flawed because it did not consider the different consequences of vesting for stock options and NVCs.  See Brower v. Brower, 61 Mass. App. Ct. 216, 221 (2004) (application of "one size fits all" rule to different assets obtained in connection with employment can be "impractical and potentially unfair").  As the judge explained, unlike stock options, NVCs "represent an actual purchase of equity in Fidelity, along with the present right to benefit in the financial successes of the company."  In other words, there is no delay in receiving the income stream generated by NVCs.  Thus, even while unvested, the husband's 2020 NVCs "demonstrated significant gain and potential for dividends or distributions of IEUs."  Specifically, they generated dividends in the amount of $202,248 in 2021 and $214,096 in 2022, and they appreciated in value (according to Fidelity's NAV) from $1,879,220 at the time of purchase to $2,891,076 at the end of trial.  To be sure, under the terms of Fidelity's operating agreement, an owner of NVCs generally cannot realize such appreciation in value (by transferring the shares or selling them back to Fidelity) until they vest, and in order for the 2020 NVCs to vest, the husband must remain employed during the graduated vesting period.  Nevertheless, given the income that NVCs can generate even when unvested, it would not have been equitable to determine which portion should be included in the marital estate based on a formula designed for the entirely contingent value of unvested stock options.[4]
      Consistent with the court's recognition in Baccanti that "one formula will not necessarily work in every case," Baccanti, 434 Mass. at 802, and that other methods of apportionment are possible, the judge explained that she may have considered "a division through offset or payment from the [h]usband" had the parties presented "a calculation of the present value of the NVCs that more fully captured" their benefits.  See generally R.D. Feder, Valuing Specific Assets in Divorce §§ 1.02, 1A.02 (C.T. Rossof & A.T. Friedman eds., 2001 & Supp. 2022-1) (discussing Internal Revenue Service's Rev. Rul. 59-60, 1959-1 C.B. 237, which sets forth factors to consider in valuing nontraded financial assets such as closely held stock).  No such calculation was offered, however.  Given these circumstances, we conclude that the judge's decision to include the 2020 NVCs (but not the 2022 NVCs) in the marital estate and assign to the wife a fifty-percent interest in those assets, as well as a fifty-percent responsibility for the associated loan, was prudent and not "plainly wrong and excessive" (citation omitted).  Zaleski, 469 Mass. at 245.
      b.  Valuation and "if and when received" distribution.  In addition to challenging the judge's inclusion of the 2020 NVCs in the marital estate, the husband contends that the judge erred in dividing them and the 2020 IEUs on an "if and when received" basis.
      In general, the present division of assets is preferred because it relieves "the court of any further supervision" (citation omitted), Dewan v. Dewan, 399 Mass. 754, 757 (1987), and provides "an immediate settlement of the distribution without entangling the parties in future litigation, and the continued strife and uncertainty it entails."  Adams, 459 Mass. at 379 n.14, citing Hanify v. Hanify, 403 Mass. 184, 188 (1988).  Where the present valuation of assets is uncertain or impractical, however, "the better practice is to order that any future recovery or payment be divided, if and when received, according to a formula fixed in the property assignment."  Baccanti, 434 Mass. at 802, quoting Hanify, supra.  See Adams, supra at 379; Canisius v. Morgenstern, 87 Mass. App. Ct. 759, 764-765 (2015).
      Here, the judge acknowledged the general preference for present division, but she concluded that such an approach was infeasible because neither party offered a net present value calculation of the assets that would allow her to determine an appropriate lump sum to use in an offset.  Instead, the judge ordered that if the husband is unable to assign the wife's interests in the 2020 NVCs and 2020 IEUs to her or to a trust for her benefit, he must hold them for her benefit "until such time as he leaves Fidelity or until the [w]ife directs the [h]usband to sell the shares on her behalf."  The husband must also pay the wife dividends or distributions, net of any taxes owed, on the NVCs and IEUs held for her benefit.
      The husband contends that this "if and when received" distribution "will leave the parties financially entangled, possibly for decades."  Any such entanglement, however, results from the alienation restrictions imposed on the assets by Fidelity, along with the parties' failure to provide a net present value for the assets.  While unvested, NVCs cannot be transferred, assigned, or cashed in; if an employee leaves Fidelity for a reason other than death or retirement before the NVCs vest, he must pay the outstanding balance on the loan minus the purchase price of the NVCs.  Once vested, NVCs may in some circumstances be transferred or assigned to certain persons as permitted under the Fidelity operating agreement, subject to its right to buy the NVCs back instead.
      The husband argues that, consistent with the proposal of his accounting expert, the judge should have allowed the husband to buy out the wife's interests using the current NAV assigned to each asset.  There was sufficient evidence, however, to support the judge's finding that the NAV does not reliably reflect the assets' present value.  Because Fidelity is not a publicly traded company, there is no public share price for its NVCs.  Instead, Fidelity determines the NAV on a quarterly basis by first calculating the adjusted net income for the company for that quarter, then dividing the total adjusted net income by the number of outstanding shares.  Fidelity does not negotiate the value of NVCs and will not buy them back at any price other than the current NAV.  At trial, the wife's accounting expert testified that the assigned NAV does not capture "all the rights, benefits, and funds attributable to ownership."  He characterized the NAV as a "buy-in number" or "liquidation value" that excludes "all elements of distributions and income," and he opined that relying on it for present division of the NVCs would deprive the wife of the value of that future income stream.[5]
      When experts present conflicting opinions concerning the valuation of a marital asset, the judge may "accept one reasonable opinion and reject the other" or, alternatively, "reject expert opinion altogether and arrive at a valuation on other evidence."  Bernier v. Bernier, 449 Mass. 774, 785 (2007), quoting Fechtor, 26 Mass. App. Ct. at 863.  Here, the judge credited the wife's expert and found that the NAV does not fully capture the value of the NVCs.  See generally Bernier, supra at 783 n.16 (noting that "valuation of any closely held corporation is fraught with uncertainties" and there are "several unknown variables present in valuing shares of a company that is not publicly traded").  In the end, "[v]aluation of a business interest is a question of fact," Adams, 459 Mass. at 380, and after reviewing the extensive trial record, we do not consider the judge's finding to be clearly erroneous, see id.
      2.  Alimony award.  The judgment required the husband to pay the wife weekly general term alimony in the amount of $10,673 until the wife remarries, either party dies, the husband attains full retirement age, or 117 months after entry of the judgment, whichever occurs first.  The husband challenges that order on several grounds.
      In reviewing an alimony decision, we conduct a two-step inquiry.  First, "we examine a judge's findings to determine whether the judge considered all of the relevant factors under G. L. c. 208, § 53 (a), and whether the judge relied on any irrelevant factors."  Zaleski, 469 Mass. at 236.  In this case, the judge considered all the relevant factors under § 53 (a).  Second, "we decide whether the rationale underlying the judge's conclusions is apparent and whether these flow rationally from the findings and rulings" (quotation and citation omitted).  Hassey v. Hassey, 85 Mass. App. Ct. 518, 524 (2014).  A judge has broad discretion in determining the amount of alimony to be paid by one divorcing spouse to another.  See Zaleski, supra at 235.
      We discern no abuse of discretion here.  The total amount of alimony and child support awarded by the judge represented "just over one[-]third of [the husband's] net weekly income."  See Hassey, 85 Mass. App. Ct. at 525.  The husband contends that the judge based the alimony order on the wife's need at the end of trial in 2023, not at the time of separation in 2020.  See Young v. Young, 478 Mass. 1, 2-3 (2017) (recipient spouse's need under general term alimony is amount "required to enable her to maintain the standard of living she had at the time of the separation leading to the divorce").  While the wife reported higher weekly expenses in May 2023 ($13,227) than in December 2020 ($10,546), and the judge found that the wife's need was approximately $13,000 per week, the judge included in that amount expenses not listed in any of the wife's financial statements, including anticipated costs for health and dental insurance.  The alimony award also included necessary maintenance and repair costs for the wife to continue to reside in the former marital home, and the judge emphasized that increased costs to maintain the marital home would not be a basis for an increase in alimony in the future.  Moreover, despite finding that the wife's need amounted to $13,000 per week, including her care for their child, the judge awarded $10,673 per week in alimony, which is close to the wife's December 2020 reported weekly expenses of $10,546.
      The husband contends that the judge failed to lower or eliminate certain expenses from the wife's claimed need, including her mortgage, homeowner's insurance, uninsured medical expenses, and future child care, but on this record those issues involve credibility determinations within "the domain of the trial judge, in which the judge's assessment is close to immune from reversal on appeal except on the most compelling of showings."  Johnston v. Johnston, 38 Mass. App. Ct. 531, 536 (1995).  See Demoulas v. Demoulas Super Mkts., Inc., 424 Mass. 501, 509-510 (1997) (judge with firsthand view of evidence is in best position to assess its weight and credibility).  For example, the judge acted within her discretion in crediting the wife's statement of the anticipated costs of the mortgage for the marital home once she refinances, not its current costs.  While the husband claims that the judge should have reduced the wife's reported medical expenses because they included expenses for the rest of the family, the judge found that the wife's most recent financial statement understated those expenses by not considering anticipated costs for health and dental insurance previously provided by the husband's employer.  As for the child's future care expenses, it was reasonable for the judge to anticipate that the wife will need additional care when she returns to work.
      Lastly, although the husband does not challenge the judge's finding that the wife's attributed annual income was $100,000, he claims that the judge abused her discretion by not commensurately reducing the alimony award based on that determination.  In particular, the husband contends that the judge engaged in impermissible "double-counting" by issuing an alimony award that "slightly exceeds" the wife's need with her attributed income included due to "the time it may take for [her] to find employment," while considering that same factor in determining her attributed income.  We are not persuaded.  The time needed for the wife to reenter the workforce was only one of several factors the judge considered in determining the wife's attributed income; the judge also considered the wife's limited experience, low earning history, and resume gaps; the child's age and needs, including that he was beginning kindergarten and would have a longer school day; and the testimony of the husband's expert on vocational consulting.  The judge also found that the husband's suggestion of $170,000 in attributed income was not "realistic under the circumstances."  In light of the judge's careful and thorough consideration of the trial record, we conclude that she did not abuse her discretion in awarding the wife $10,673 in weekly alimony.  See C.D.L. v. M.M.L., 72 Mass. App. Ct. 146, 157 (2008).[6]
                                                
 
Judgment affirmed. 
footnotes

          [1] As is our custom, we use the names appearing on the complaint for divorce, notwithstanding that the wife has resumed using her former name, Leila El-Youssef.
          [2] The mandatory statutory factors are 
     "the length of the marriage, the conduct of the parties during the marriage, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties, the opportunity of each for future acquisition of capital assets and income, and the amount and duration of alimony, if any, awarded under sections 48 to 55, inclusive." 
G. L. c. 208, § 34.  The judge "may also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates and the contribution of each of the parties as a homemaker to the family unit."  Id.  See Baccanti, 434 Mass. at 791-792.
          [3] We do not mean to suggest that judges have freedom to avoid a Baccanti apportionment based only on a conclusion as to "the equities."  Here, the NVCs at issue had not vested as of the time trial began, and they had not fully vested as of the time of judgment.  Their vesting was dependent upon the husband continuing to work for Fidelity for several more years -- efforts that would take place outside the marriage.  The judge found that the NVCs were "a retention tool" in addition to compensation for past work.  Under Baccanti, this scenario would require consideration by the court before fixing the asset division.
           In this case, however, the NVCs were a complicated instrument, different from the stock options at issue in Baccanti, in that the right to receive distributions from the NVCs had vested immediately upon purchase in December 2020, during the marriage.  Moreover, the judge could have apportioned some of the 2022 NVCs to the wife as they were also acquired before the divorce judgment and arguably arose in part from the husband's efforts during the marriage, but the judge chose to award none of those.  In the circumstances, we do not discern error in the judge's division of the assets.
          [4] We do not address whether or how the modified time rule formula in Baccanti might be applied to other forms of executive compensation.
          [5] The husband emphasizes the testimony of Fidelity's controller that "the NAV is commensurately reduced by distributions," but her testimony on this point was equivocal.  While stating that the distribution of IEUs "essentially" reduces the NAV, she also acknowledged that the NAV is just a "book value" that "doesn't consider the future dividends or earnings potential for the stock."
          [6] The wife's request for appellate attorney's fees is denied.  Although the husband's arguments are unpersuasive, they are not frivolous.  See Marabello v. Boston Bark Corp., 463 Mass. 394, 400 (2012).