PEGGY SUE COOPER vs. PHILIP ALAN COOPER
(and a companion case[1]).

Nos. 02-P-846 & 03-P-760.

Middlesex. December 9, 2003. - September 24, 2004.

Present: DUFFLY, SMITH, & DOERFER, JJ.

*Divorce and Separation,* Child support, Alimony, Modification of judgment,
Attorney's fees. *Parent and Child,* Child support. *Practice, Civil,* Contempt,
Attorney's fees. *Contempt.*

A Probate and Family Court judge did not abuse her discretion in modifying a
child support order to increase payments for the support of three children
after taking into account the husband's significantly enhanced standard of
living since the divorce and changes in the circumstances of the parties
that had the effect of reducing the children's standard of living when resid-
ing with his former wife, but nothing supported that aspect of the order
requiring the husband to continue to pay the increased amount each year
without adjustment for the emancipation of the older children. [134-137]
In an action to modify a divorce judgment, the judge's subsidiary findings did
not support the ultimate finding that the original alimony award did not
equalize the parties' current station in life; therefore, this court vacated so
much of the modification judgment as awarded alimony in excess of that
provided under the original divorce judgment, and directed that on remand,
any additional award of alimony should be made only on appropriate find-
ings that increases in the husband's income were of such a magnitude as to
be well in excess of adjustments to income reasonably anticipated by the
parties' separation agreement, and that the agreement's provisions for sup-
port and property were inadequate to maintain the wife in the standard of
living enjoyed by the parties while married. [137-140]
A Probate and Family Court judge properly exercised her discretion in award-
ing attorney's fees and expenses incurred by a wife in prosecuting a
complaint seeking modification of a divorce judgment, where the judge's
findings evinced a consideration of the appropriate factors and were suf-
ficiently supported by the evidence. [140-143]
A Probate and Family Court judge's adjudication of a husband as being in
contempt for failing to pay alimony as required by a judgment modifying a
previous judgment of divorce nisi was precluded by the judge's finding
that the husband had paid the alimony and thus had purged his contempt
prior to the hearing on the contempt complaint, but under the circumstances
of the case, the judge was warranted in awarding legal fees and costs.
[143-144]

---

[1]The companion case is between the same parties.

COMPLAINT for divorce filed in the Middlesex Division of the Probate and Family Court Department on March 15, 1994.

A complaint for modification, filed on November 13, 1996, and a complaint for contempt, filed on February 27, 2001, were heard by *Sheila E. McGovern,* J., as were motions for allowance of attorney's fees.

*Kirk Y. Griffin* for Philip Alan Cooper.

*Patricia Saint James* for Peggy Sue Cooper.

DUFFLY, J. We again consider the extent to which a prior child support order may be modified on evidence that a noncustodial parent's income has so increased since the divorce that there is no question of an ability to pay any reasonable order. See *Brooks v. Piela,* 61 Mass. App. Ct. 731 (2004). In this appeal from a judgment of modification, Philip Cooper also challenges the increased alimony award, claiming that Peggy Cooper, his former wife, failed to establish a material change in circumstances justifying increases in alimony and child support and that the increases were excessive in relation to the parties' station in life during the marriage. Philip contends that the magnitude of the modified alimony and child support orders effects an improper revision of the parties' property distribution. Also before us are Philip's appeal from a judgment finding him guilty of contempt and his challenges to various orders awarding attorney's fees.

A. *Modification judgment.* 1. *Background.* The parties' divorce ended a nineteen-year marriage during which three children were born. Pursuant to their June 15, 1995, divorce judgment nisi, which incorporated and merged the parties' separation agreement, Peggy was to have primary physical custody of the children (three, ten, and thirteen years old at the time), and Philip was to pay Peggy monthly child support totaling $4,998 ($1,666 per month for each of the children), subject to cost-of-living adjustments and a reduction of forty percent in each child's allocated support payment as that child entered college. The parties agreed to share the children's uninsured medical and dental expenses and the cost of Hebrew school and academic tutoring. To the extent college expenses were not covered by funds maintained for the benefit of the children, the parties agreed they would each contribute to this expense in light of their financial circumstances at the time.

The marital home in Weston was to be sold, but until then Peggy and the children were to continue to live there. The home was already on the market, at an asking price of $ 1.9 million, when the agreement was executed. The parties agreed to share in the net proceeds from the sale, after payment of the mortgages and certain other debts and after funding accounts (for expenses such as uninsured medical care, and for college) that had been established for the children. From his share of the proceeds, Philip was to pay Peggy an additional sum of $142,152, representing her share in other marital assets.[2]

Philip agreed to pay Peggy, a full-time homemaker during the marriage, $2,500 per month in alimony,[3] payments not to begin until after the sale of the marital home. The house sat on the market for much longer than the parties had anticipated, and without alimony, Peggy experienced difficulty in meeting her living expenses and those of the children. A $100,000 equity line of credit, which the parties had taken out to pay the first mortgage payments of principal and interest, real estate taxes, and insurance on the house during the period it was on the market, was exhausted by January, 1996. In order to continue to meet the carrying costs of the still unsold house, the mortgages were refinanced and additional funds borrowed. A new first mortgage in the principal sum of $875,000 was used to pay off the original first mortgage in the amount of $687,000 and the $100,000 drawn against the equity line. The house finally sold, in February, 1997, for $1.15 million. There were no proceeds subject to division after paying the mortgage and certain debts of the parties and funding the children's accounts.

[2]In addition to the payment of $142,152, Peggy was to receive half of the parties' nonliquid private securities, which were not valued at the time of the divorce. At the time of the modification hearing, Peggy's financial statement ascribed the following values to certain of these securities: EXA Corp. ($10,000), Direct Report ($10,000), Vintage Partners ($23,944), Hubbard Harpsichords ($15,000), Health Development Corp. ($4,000), WCAS Venture Partners ($500), and Babette's LP ($2,000). In addition, she received 6,000 shares in Object Design, Inc., which the judge found had a value of $45,000 at the time of the hearing.

[3]Alimony was subject to cost-of-living increases similar to those provided for child support, as well as downward adjustments in certain circumstances, but otherwise was to continue until the death of either party or Peggy's remarriage.

Following the sale, and because she could not find a house she could afford in Weston, Peggy purchased a smaller home in Sharon for $328,000 and moved there with the three children. Philip, who had remarried in June of 1996, purchased and extensively remodeled another home in Weston, just twelve houses away from the former marital residence. He lives there with his current wife, Lisette; their son; and Lisette's son from a prior marriage.

2. *The proceedings.* When the Weston house still had not sold five months after the parties agreed to sell it, Peggy filed a complaint for modification alleging as material changes in the parties' circumstances the failure of the house to sell as anticipated, increased expenses, and improvements to Philip's financial circumstances. She requested increases in child support and that Philip pay the carrying costs of the house until it sold. Peggy also asked to have alimony payments commence immediately (but did not then ask for an increase in alimony). Because the mortgage refinancing had substantially depleted the equity in the home, she sought a reallocation of her share of debts that were to have been paid out of the sale proceeds.

By the time of the eventual trial on this complaint, Philip's financial circumstances had dramatically improved. In 1995, the year of the hearing on the divorce, Philip earned $270,000; he received an additional $30,000 as a member of various corporate boards. Little more than a year later, in August, 1996, Philip joined the New York investment firm Goldman Sachs, LP, as a portfolio manager; his salary, annualized, would have been $600,000 for the year. His income structure in 1997 provided Philip with a base salary of $150,000 plus cash bonuses. His 1997 bonus was $1.1 million; in 1998, it was $1.45 million. In December, 1998, upon Philip's promotion to managing director, his base salary doubled to $300,000; his bonus in 1999 was $1,947,500. In addition, following an initial public offering of the firm approved by the partners in early 1999, a number of options and shares in the common stock of The Goldman Sachs Group, Inc., were made available to certain executives, including Philip.

In April, 1999, when the parties were in court in connection with Peggy's motion for temporary orders, they entered into a

stipulation increasing child support payments from $4,998 to $13,125 per month.[4] Philip continued to pay alimony under the terms of the divorce judgment, which now was $2,602 per month. Two months later, over Philip's objection, Peggy was given leave to amend her modification complaint to add a request for increased alimony.

Following trial, which occurred over six days in September and December, 1999, the Probate and Family Court judge modified the divorce judgment by significantly increasing child support (to $13,125 per month) and alimony (by adding an amount equal to eighteen percent of Philip's bonuses), and imposing on Philip the sole financial burden of the children's education, medical expenses and costs of their extracurricular activities. Philip appealed.

3. *Discussion.* Our review recognizes that, in fashioning an appropriate modification judgment, the probate judge enjoys considerable discretion, and the judgment will not be reversed unless it is "plainly wrong." *Schuler* v. *Schuler*, 382 Mass. 366, 368 (1981). This standard is deferential to a judge's decision, but that deference is not without limit. *Boulter-Hedley* v. *Boulter*, 429 Mass. 808, 811 (1999). "Error of law apparent on the record, such as the failure of a judge's findings to support the judge's action or findings that have no support in the evidence, would constitute an abuse of discretion." *Freedman* v. *Freedman*, 49 Mass. App. Ct. 519, 521 (2000). When the judgment to be modified incorporates an agreement of the parties, we have said that, notwithstanding that the agreement does not survive the judgment as a binding contract, we nevertheless will "review the findings to determine whether the judge gave appropriate consideration to the parties' intentions as expressed in their written agreement, . . . and to any changes in their circumstances since the last modification judgment." *Huddleston* v. *Huddleston*, 51 Mass. App. Ct. 563, 568 (2001). See *Bercume* v. *Bercume*, 428 Mass. 635, 644 (1999) ("To the extent possible, and consistent with common sense and justice, the modified

---

[4]In the stipulation, which provides that the parties' agreement shall be made a temporary order of court, Philip also agreed that he would "be responsible for the payment of all uninsured medical and dental expenses for the children," and "for the payment of the children's college and private school education."

judgment should take into account the earlier, expressed desires of the parties").

a. *Child support.* We emphasize that the circumstances to which our discussion applies are those falling far outside of the Massachusetts Child Support Guidelines, in which a noncustodial parent's very substantial income (or other sources of support) permits him or her to enjoy a highly elevated standard of living. In such cases, the ability to pay any rationally based award is conceded, and the dispute focuses on what constitutes a reasonable award.

Here, the modification judgment ordered that monthly child support payments be increased to $13,125, or $157,500 per year, with payments to continue, without adjustment for college matriculation, until the youngest child's emancipation.[5] Philip was also ordered to pay the children's uninsured medical and dental expenses and the costs of "all of the children's extracurricular activities and summer camp (including, without limitation, tutoring, if applicable)." The judge's stated bases for these modifications were (1) changes in the parties' circumstances, including Philip's substantially increased income as well as the delay in the sale of the Weston house and the attendant financial burdens that this imposed on Peggy; (2) the needs of the children, determined "in the context of their former station in life," their father's higher standard of living, and changes in the children's emotional and physical health since the divorce; and (3) Philip's trial stipulations, in which he agreed to be solely responsible for the costs associated with the private school and college educations of the three children and their uninsured medical and dental costs.[6]

On appeal, Philip challenges as excessive the amount of the monthly child support order (at least when coupled with the increased alimony order), but makes no separate challenge to

[5] At the time of the modification trial, the oldest child had just enrolled in her first year at college, and the two younger children were fourteen and seven years old.

[6] It is implicit in the judge's findings that she took into account Philip's agreement to pay $13,125 per month for child support. We agree that while the stipulation for temporary orders was not binding beyond the context in which it was made, see *Cohan* v. *Feuer,* 442 Mass. 151, 156 (2004), it was evidence of what the parties considered to be a reasonable amount of support.

orders that he pay college tuition and other expenses of the children. As to the claim of excessive child support, he argues that (1) the children's needs had not materially changed since the divorce, and (2) the amount of the current award, as well as the order requiring that he pay this amount without adjustment (as provided for in the parties' agreement) as each child attends college and then becomes emancipated, is "an example of a punitive and impermissible post-divorce mechanism for property division."[7]

Although Philip's reliance on *Heins* v. *Ledis*, 422 Mass. 477 (1996), to support this proposition is misplaced,[8] we have elsewhere suggested that where a child support award is excessive and not rationally related to the reasonable needs of children, it "may constructively distribute the noncustodial parent's estate, provide a windfall to the child and custodial spouse, and infringe upon the noncustodial parent's right to direct the lifestyle of his or her children." *Pearson* v. *Pearson*, 52 Mass. App. Ct. 156, 160 (2001). On the other hand, we have said "children's needs are to be defined, at least in part, by their parents' standard of living and . . . children are entitled to participate in the noncustodial parent's higher standard of living when available resources permit." *Brooks* v. *Piela*, 61 Mass. App. Ct. at 737. A determination of a child's reasonable needs will vary with the parties' circumstances. It is within the sound discretion of a probate judge who has appropriately considered the parties' circumstances during the marriage as well as at the time of any modification proceeding, and the child's best

---

[7]Philip also argues that findings as to the children's needs for medical treatment and therapy do not constitute changed circumstances, because "all of them had their origins prior to June of 1995." The findings, which describe, with respect to the three children, "worsening symptoms" and "physical and emotional difficulties because of the divorce," are amply supported by the evidence and are not clearly erroneous.

[8]The *Heins* case concerned an appeal from a divorce judgment awarding alimony at least in part to compensate the wife for the loss of her investment in the husband's business. *Heins* v. *Ledis*, 422 Mass. at 483. There was no finding in that case that the wife was in need of alimony and it was thus not proper "to use alimony as a mechanism for such a property division." *Id.* at 484.

To the extent the argument is intended to apply as well to his appeal from the alimony award, we need not reach the issue because we vacate, on other grounds, those aspects of the award appealed from. See *infra*.

interests, to determine whether and to what extent a child's needs are unmet by an existing order. Cf. *Ames* v. *Perry*, 406 Mass. 236, 242-243 (1989); *Dennis* v. *Dennis*, 29 Mass. App. Ct. 161, 165 (1990).

Here, the probate judge appropriately took into account Philip's significantly enhanced standard of living since the divorce and changes in the circumstances of the parties that had the effect of reducing the children's standard of living when residing with Peggy. The fact that Philip agreed to be responsible for all of the children's college costs and other expenses related to their extracurricular activities and that he had, in connection with Peggy's motion for temporary orders, stipulated that $13,125 per month was an appropriate level of child support, was also relevant to the judge's determination.

Although the award was high and we might have made a different order, in light of the foregoing we cannot say that the judge abused her discretion in making the award she did for current child support. However, we find nothing in the findings to support that aspect of the order requiring Philip to continue to pay $157,500 per year without adjustment for the emancipation of the older children. In the absence of such findings, and because the findings also reflect no consideration of the parties' intentions as to future adjustments, we vacate this provision in the judgment of modification and remand the issue for further consideration. See *Bercume* v. *Bercume*, 428 Mass. at 645. Cf. Child Support Guidelines, preamble (providing for modification upon showing of twenty percent discrepancy between current child support order and what the guidelines would provide unless, inter alia, current order resulted from "an agreement of the parties and there has not been a change in the circumstances which resulted in a rebuttal of the guideline amount").

b. *Alimony*. The modification judgment substantially increased Philip's alimony obligation. In addition to the $2,602 per month provided for by the parties' separation agreement — which, under the modification judgment, was to be paid from Philip's base salary — the judgment ordered additional alimony in an amount equal to eighteen percent of the gross cash portion of any bonus he received. Based on this order, additional, retroactive alimony was awarded for 1998 in the amount of

$198,000, for 1999 in the amount of $261,000, and for 2000 in the amount of $350,550 (with six percent simple interest added to the awards due for 1998 and 1999). In addition, the judgment ordered that, on or before February 1, 2001, Philip was to pay alimony equal to eighteen percent of his "gross income from the [Goldman Sachs] IPO award," requiring a further payment in the amount of $92,945.

To support the increase in alimony, the judge found that during their marriage the Coopers had enjoyed a "very high standard of living." They had lived in the "affluent community" of Weston since 1981, owned seven "expensive" cars, and an airplane in which they flew to Nantucket for dinner. The parties entertained frequently in their 7,000 square foot home, which boasted five bedrooms, six bathrooms, an au pair suite (in which a full-time au pair had resided) and guest quarters. Peggy and Philip traveled often and vacationed at "exclusive resorts," and Peggy and the children went to Florida twice yearly to visit family. The children went away to expensive camps.

The judge determined that Peggy had suffered a decline in this affluent lifestyle since the divorce, moving to a more modest home, eating out less often and at cheaper restaurants and vacationing on a budget, while Philip suffered no such decline.[9]

The judge properly focused on the parties' marital lifestyle in assessing Peggy's current needs. See *Kittredge* v. *Kittredge*, 441 Mass. 28, 44 (2004); *Goldman* v. *Goldman*, 28 Mass. App. Ct. 603, 611-612 (1990); *Kehoe* v. *Kehoe*, 31 Mass. App. Ct. 958, 959 (1992).[10] However, indicia of that marital lifestyle as reflected in the findings were without reference to the cost of

[9]Findings related to Philip's higher living standard detail vacations in Europe, Florida, and Puerto Rico, among other places. Philip continues to maintain a home for his parents in Boca Raton, Florida. For his sister, Philip and his wife Lisette purchased a house in Weston for $400,000, making a down payment of $80,000. Philip and Lisette pay the monthly payments, including interest and principal, on the $320,000 mortgage, as well as the real estate taxes. In August, 1999, Philip and Lisette made an offer to purchase a home in Nantucket for $700,000, and an office for Lisette in Weston for $400,000.

[10]The judge specifically found that Peggy made no postmarital contribution to Philip's career, and that "Philip's college classmate and Lisette, his second wife, created and assisted in" securing his position at Goldman Sachs. Lisette, who has a Ph.D. from Harvard and is a certified financial analyst, provides

maintaining it, making it difficult to assess the propriety of the judge's order.[11] This difficulty is exacerbated by additional findings and evidence that belie the level of current support needed to maintain Peggy in the lifestyle she enjoyed while married. The judge found that, at the time of the divorce, the parties were paying approximately $9,300 per month to run the 7,000 square foot house, including $1,000 for grounds maintenance. There was evidence that Peggy's expenses and those of the children while living in Weston totaled $3,741 weekly, or $194,532 per year, an amount entirely consistent with annual household income of $300,000.[12] There was no finding that the parties lived beyond their means during the marriage in order to support their affluent lifestyle.[13] Cf. *Weishaus* v. *Weishaus*, 360 N.J. Super. 281, 289 (App. Div. 2003) (when determining parties' standard of living during marriage, appropriate to consider earnings that supported it as well as whether it was supported by liquidation of family assets, borrowing, or gifts), *affd. in part*, 180 N.J. 131, 144-145 (2004). The judge made no findings regarding the parties' intentions, as reflected in the separation agreement. See *Bercume* v. *Bercume*, 428 Mass. at 643-645. There were, for example, no findings indicating to what extent the increases in Philip's income were contemplated by the parties or whether the separation agreement provided Peggy with sufficient property and support to enable her to live in the station she had enjoyed while married.

The judge's subsidiary findings do not support the ultimate finding that the alimony award does "not . . . equalize the par-

---

financial consulting services to clients through Athena Capital, a business she founded in 1993.

[11]For example, the findings note "seven expensive cars" were owned by the parties. These include four retained by Philip, which the separation agreement lists as having a total value of $26,250; Peggy's automobiles are set forth in her financial statement as having a total value of $10,600.

[12]There was evidence that in 1983 and 1991, Philip's sale of businesses resulted in substantial capital gains. The extent to which the proceeds from these sales fueled the parties' lifestyle, or were used to acquire assets, was not reflected in the findings. We also note that the record reflects that Philip's average income for the years 1991 through 1995, including capital gains realized in 1991 ($1,237,539), was consistent with his earnings in 1995.

[13]Other than the mortgage on the house, the only significant debts listed on the parties' financial statements (attorney's fees, cost of experts, expenses of maintaining the Weston house until it was sold) were divorce-related.

ties' current station in life but . . . ensure[s] that the station in life acquired *during the marriage* is maintained" (emphasis in original). The total support awarded (alimony and child support was $508,000 for the year 2000) is far in excess of what the record evidence suggests would be needed to maintain the life-style enjoyed by the parties while married. In the absence of specific findings, grounded in evidence, that the amount was consistent with that lifestyle, the award cannot stand.

To the extent that the amount of the award relies on the judge's finding that it was made in part to "ensur[e] future continuity of the former marital station," it also was improper. An alimony award that exceeds current need, so as to permit accumulation of assets or savings for the future, may be appropriate only when that award is made pursuant to G. L. c. 208, § 34. "Under G. L. c. 208, § 34, alimony and property division are interrelated. . . . Need is a major element, but obviously not the only one, in an equitable distribution of property under § 34." *Rosenberg* v. *Rosenberg*, 33 Mass. App. Ct. 903, 904 (1992). However, "where the trial court has previously passed on the issue of alimony in the divorce judgment, the correct course of action . . . is the post-divorce complaint for modification, implicating the traditional test of a material change in circumstances." *Buckley* v. *Buckley*, 42 Mass. App. Ct. 716, 719 (1997).

We therefore vacate so much of the judgment as awards alimony in excess of that provided under the original divorce judgment. On remand, any additional award of alimony shall be made only on appropriate findings that reflect the considerations outlined in this opinion, including whether increases in Philip's income were of such a magnitude as to be well in excess of adjustments to income reasonably anticipated by the parties' separation agreement; and whether the agreement's provisions for support and property were inadequate to maintain Peggy in the standard of living enjoyed by the parties while married.

c. *Attorney's fees.* The judge awarded $252,275.93 in attorney's fees and expenses[14] incurred by Peggy in connection with her prosecution of the modification complaint, consisting

---

[14]Included in this amount are expenses totaling $15,684.94. There was no challenge to this aspect of the award.

of $198,351.69 for the fees and costs of her current counsel, $16,877.24 for her prior counsel, and $37,047 in expert witness fees.[15] Philip contends that the amount awarded for the services rendered by Peggy's current attorneys was unreasonable, in that the case was relatively straightforward and the efforts of multiple counsel likely resulted in a duplication of effort; that substantial time was devoted to successor counsel becoming educated abut the case, after taking over from prior counsel; and that Philip's conduct did not cause delay in the proceedings.[16] He took issue with approximately $7,000 that was assessed in connection with the expert's fees, as not "reasonably correspond[ing] with the scope of the problem presented."

The probate judge has discretion in awarding attorney's fees in appropriate circumstances. G. L. c. 208, § 38. We will not disturb an award that is "not incommensurate with an objective evaluation of the services performed." *Ross* v. *Ross*, 385 Mass. 30, 38-39 (1982), citing *Smith* v. *Smith*, 361 Mass. 733, 738 (1972). In determining the propriety of an award of attorney's fees in a domestic relations setting, we have identified as among the relevant factors to be considered "the ability of the wife's counsel, the work performed, the results secured, the time spent, the hourly rates, the existence of contemporaneous time records, the financial positions of the parties, and the husband's obstructionist conduct which prolonged the proceedings . . . ." *Downey* v. *Downey*, 55 Mass. App. Ct. 812, 819 (2002). "We recognize that a calculation of attorney's fees requires an exercise of judgment involving the application of many factors, and that any award made will be entitled to considerable respect on review." *Robbins* v. *Robbins*, 16 Mass. App. Ct. 576, 582 (1983), quoting from *Kane* v. *Kane*, 13 Mass. App. Ct. 557, 560

[15]Philip's request that we vacate the award of $5,670 in fees incurred in connection with Peggy's opposition to Philip's motion for reconsideration of the modification judgment is unsupported by argument or citation to relevant authority. We therefore decline to address it.

[16]With respect to the award in the amount of $16,877.24 for Peggy's former attorney, Philip took "no exception [to] the amount of his fees." Rather, he "disclaimed any responsibility" for the consequences of what he terms the attorney's abandonment of his client, Peggy, i.e., increased fees of her current counsel resulting from the transition in legal representation.

(1982). See *Robbins* v. *Robbins*, 19 Mass. App. Ct. 538, 542 (1985) (award should take into account "the fact that we do not have a claim of counsel against their own client, but a claim against the adversary. Therefore the fees these counsel could reasonably charge to their own clients for like services must be checked against an independent, 'objective' valuation of the services they rendered in fact").

The judge's findings reflect that, in arriving at the award, she relied upon her extensive knowledge of the case and her observation of counsel, see *id.* at 543 n.10, as well as on the affidavits of counsel and their written submissions detailing the billing rate of the attorneys and tax expert, identifying the nature of the services rendered and the corresponding amount of time spent, as well as the relationship of the services rendered to the proceedings. There is evidence in the record of the judge's thorough consideration of all of the relevant submissions.[17]

The judge said that she had "considered the amounts involved, the importance of the issues, and the amount of time reasonably demanded of counsel." She found that the rates charged by Peggy's counsel were reasonable, in light of their experience, training, reputation, and demonstrated skills. Her findings point to the fact that in addition to trial, numerous pretrial contested motions required preparation and appearances by Peggy's attorneys, and her fees were increased due to "Philip's continued failure to comply with discovery requests." She noted as well that at trial the attorneys "divided certain tasks . . . between them in an efficient manner so as to avoid unnecessary duplication." The judge also took into account Peggy's financial circumstances and the relative differences in the parties' resources. See *Hano* v. *Hano*, 5 Mass. App. Ct. 639, 642 (1977).

The judge considered the tax expert's experience and training, and the reasonableness of the expert's hourly rate compared to that of similarly qualified experts appearing before the court on similar issues. Cf. *Robbins* v. *Robbins*, 22 Mass. App. Ct.

---

[17]The probate judge instructed counsel to identify the number of hours expended in connection with postdivorce, rather than modification, matters, which resulted in a reduction of $31,236.76 in the amount requested and awarded.

982, 983 (1986). She found the expert to be "highly qualified" and that he had provided the court with "invaluable expertise with respect to the quite complex financial aspects of this case."

The findings evince a consideration of the appropriate factors and were sufficiently supported by the evidence. There was no abuse of discretion.

It was also not an abuse of discretion to award Peggy attorney's fees to defend against Philip's appeal. See G. L. c. 208, § 38; *Peterson* v. *Peterson*, 30 Mass. App. Ct. 932, 933-934 (1991). In awarding $30,000, the judge could take into account the "imbalance of power and control" between the parties throughout the proceeding, Philip's obstructionist tactics, and the parties' respective financial positions. See *Cox* v. *Cox*, 56 Mass. App. Ct. 864, 881 (2002).

B. *Contempt judgment.* A judgment entered, pursuant to Peggy's complaint for civil contempt, that adjudicated Philip to be in contempt for failing to pay alimony as required by the modification judgment, and ordered that he pay attorney's fees in the amount of $13,825.62. Philip appealed from the contempt adjudication and the award of fees.

We reject Philip's argument that his failure to pay was excused during the pendency of motions seeking to stay the modification judgment. See Mass.R.Dom.Rel.P. 62(g) (1992) (filing an appeal "shall not stay the operation . . . [ii] of any other order or judgment of the court relative to . . . alimony, support, or maintenance"); *Keller* v. *O'Brien*, 425 Mass. 774, 785 (1997) (following a denial of alimony termination, absent the allowance of a stay, the payor spouse must continue alimony payment pending the appellate court's decision).

We agree, however, that an adjudication of contempt is precluded by the judge's finding that "the [h]usband eventually did pay the money, and has purged his contempt prior to the hearing." See *Hennessey* v. *Sarkis*, 54 Mass. App. Ct. 152, 156-157 (2002). "The husband's appeal from this judgment therefore reduces itself to the argument that he should not have been assessed attorney's fees. There was, however, ample basis for the judge to exercise her discretion under G. L. c. 208, § 38, to order an award of attorney's fees payable to the wife's counsel

in order to mitigate expenses incurred as a result of the husband's obstructionist conduct." *Id.* at 157.

As the judge also found, Peggy was caused to incur legal fees and costs in connection with prosecuting a contempt action to enforce the judgment; Philip sought no stay of the order until the date of the first contempt hearing in March, 2001, four months after entry of the modification judgment; thereafter, despite the probate judge's denial of Philip's motion to stay on April 2, 2001, and this court's denial of his request for stay, Philip still did not pay alimony arrears until the day of the contempt hearing on April 27, 2001. In these circumstances, the judge was warranted in awarding legal fees and costs. See G. L. c. 208, § 38; *Kelley* v. *Kelley,* 374 Mass. 826, 827 (1978); *Krock* v. *Krock,* 46 Mass. App. Ct. 528, 533 (1999).

C. *Conclusion.* We vacate so much of the judgment of modification as orders alimony in amounts in excess of those provided for by the divorce judgment, and requires current child support to continue through the emancipation of the youngest child. We remand for further proceedings, consistent with this opinion, on the issues of additional alimony and future child support. In all other aspects the judgment of modification is affirmed. The orders awarding attorney's fees in connection with the modification judgment and reconsideration thereof are affirmed. The judgment of contempt is reversed; the order awarding fees incurred in connection with that action is affirmed. The order awarding fees to defend the appeal is affirmed. Because we conclude that the appeal was not frivolous, we deny appellee's request for double costs of the appeal. See *Avery* v. *Steele,* 414 Mass. 450, 455 (1993).

*So ordered.*