NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13473


AMY SUE OPENSHAW  vs.  GLEN ROMNEY OPENSHAW.



Plymouth.      December 6, 2023. - March 7, 2024.

Present:  Budd, C.J., Gaziano, Lowy, Kafker, Wendlandt,
                   & Georges, JJ.[1]



Divorce and Separation, Alimony, Division of property, Findings.
     Statute, Construction.  Words, "Marital lifestyle," "Need."




     Complaint for divorce filed in the Plymouth Division of the
Probate and Family Court Department on December 7, 2018.

     The case was heard by Edward G. Boyle, III, J.

     The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.


     Jason V. Owens for the husband.
     Shaun B. Spencer for the wife.
     Andrea C. Kramer, Laura Gal, Kate Barry, Kimberly A.
Bielan, & Jamie Ann Sabino, for Women's Bar Association of
Massachusetts, Inc., amicus curiae, submitted a brief.
     Margaret J. Palladino, for Mass Family Advocacy Coalition,
amicus curiae, submitted a brief.


―――――――――――――――――――

     [1] Justice Lowy participated in the deliberation on this case
prior to his retirement.

WENDLANDT, J.  Many married couples privileged to have sufficient income often, as the idiom counsels, "save something for a rainy day";[2] they might, for example, regularly set aside a portion of their income to purchase stocks and bonds, rather than country club memberships and recreational boats.  In this case, we are asked to consider for the first time the question whether a judge may account for a divorcing couple's custom of making regular contributions to their savings plans in determining, under G. L. c. 208, § 53 (alimony statute or § 53), the amount of alimony needed to maintain the marital lifestyle.  Where, as here, the record supports that ongoing, regular saving was part of the couple's standard of living during the long-term marriage and that the parties' combined postdissolution income is adequate to allow both spouses to maintain the standard of living enjoyed during the marriage, we conclude that such consideration is appropriate.

We further conclude that the Probate and Family Court judge did not abuse his direction in determining the recipient spouse's need for support in view of her reported expenses at the time of the trial, but that the judge's unexplained allocation of over ninety-eight percent of the parties' marital

_____

[2] The idiom may be traced back in English to the 1580s, appearing in the work "Bugbears":  "Wold he haue me kepe nothyng agaynst a raynye day?"  Oxford English Dictionary, https://www.oed.com/dictionary/rainy-day_n?tab=meaning_and_use#121516965.

liabilities to the payor spouse is unsupported by the judge's findings and at least arguably inconsistent with the judge's conclusion as to the equitable division of the marital estate under G. L. c. 208, § 34. We therefore remand with instructions to reevaluate the portion of the judgment regarding the allocation of marital liabilities in light of our opinion and to enter a new judgment accordingly.[3]

1. Background.[4] In August 1991, Amy Sue Openshaw (wife) and Glen Romney Openshaw (husband) were married in Salt Lake City, Utah. The couple eventually moved to Massachusetts. They had six children[5] and enjoyed an upper middle class lifestyle; they funded their children's participation in extracurricular activities, contributed to their children's rent while the children attended college, sent some of their children to private high school, and accumulated personal property of significant value, such as jewelry, a collection of approximately twenty firearms, tools and equipment, home

---

[3] We acknowledge the briefs of amici curiae Mass Family Advocacy Coalition and Women's Bar Association of Massachusetts, Inc.

[4] While the judge made numerous findings, we summarize only those findings and facts relevant to the issues on appeal. See Young v. Young, 478 Mass. 1, 3 (2017).

[5] Three of the children remained unemancipated as of the date of the trial; one was enrolled in college, and the two youngest were in high school.

furnishings, fine art and antiques, and a grand piano.

In addition, because of the couple's generous annual income of over $1.3 million,[6] and their comparatively modest spending,[7] they also routinely allocated significant portions of their income to investments and savings.  The couple habitually transferred any funds not used to cover the family's immediate expenses to specific investment and retirement accounts on a monthly basis.  They also consistently donated approximately ten percent of their income to their church in accordance with the tenets of their faith as members of the Church of Jesus Christ of Latter-day Saints.[8]

The parties' cumulative assets amounted to at least $4.5 million,[9] several million of which was in the form of checking, savings, investment, and retirement accounts.  The couple lived

---

[6] This figure represents the couple's approximate average annual reported gross income across 2016 and 2017, the two full years preceding their separation.

[7] The husband asserted marital spending of $146,241 in 2016 and $158,293 in 2017, excluding taxes and tithing.  The wife's financial statement indicated substantially higher spending, but still just a fraction of marital income.

[8] The couple's joint tax returns for 2016 and 2017 show $131,039 and $172,167 in charitable giving, respectively.

[9] The wife's March 2021 financial statement claims assets of $4,575,869.40.  The husband's March 2021 financial statement claims assets of $4,717,579.18.  Both figures include the value of the parties' marital home, which they owned free and clear.

together in the marital home in Hanover, which was valued at over $1.2 million, until November 2018.

2. <u>Prior proceedings</u>.  In December 2018, after nearly thirty years of marriage, the wife filed a complaint for divorce.[10]  At trial, the parties contested custody of their youngest child, alimony, child support, and the division of the marital estate.  At the time of the trial, the wife resided in the marital home, and the husband lived in Florida; the husband maintained little to no contact with any of the unemancipated children for the two years prior to trial.[11]

In June 2021, the trial judge entered a judgment of divorce nisi, supported by a written memorandum comprising seventy-three enumerated paragraphs setting forth the judge's findings of fact as well as the rationale for his decision on the disputed matters.  The judge granted sole legal and primary physical custody of the couple's minor child to the wife.  Pursuant to the Child Support Guidelines, the judge also ordered the husband to pay the wife $980 per week in child support.  On appeal, the

---

[10] The wife had also filed a complaint for divorce in June 2017, but the parties reconciled.

[11] On November 1, 2018, the wife obtained an abuse prevention order against the husband on behalf of herself and their two then-minor children.  The order expired in September 2019.

husband does not contest the custody award or the amount of child support.

With respect to alimony, after weighing the factors prescribed under the alimony statute, see discussion infra, the judge ordered the husband to pay $5,020 per week to the wife This amount was derived from the wife's reported total weekly spending provided on her most current financial statement, which included $1,000 per week in savings and $730.64 per week in charitable giving.[12]  Together with child support, the judgment required the husband to make total weekly payments of $6,000 to the wife.

With respect to the division of the marital estate, the judge stated:

> "In light of all the factors set forth in G. L. c. 208, § 34, especially the disparity in the parties' employability and opportunity to acquire future assets and income, the [c]ourt finds that a division of the marital estate with [the w]ife receiving approximately [fifty-five percent] and [the h]usband receiving approximately [forty-five percent] is most equitable."

Consistent with this desired distribution of the marital estate, the judge divided the marital assets between the parties fifty-five percent to forty-five percent, in favor of the wife.

Stating that "the [c]ourt finds it equitable to order the parties to be responsible for the payment of the liabilities

---

[12] The judge excluded some of the wife's claimed expenses from his calculation.  See infra, note 21.

listed in his or her individual name," the judge assigned to the husband liabilities of approximately $343,280 and consisting almost entirely of the family's income taxes incurred in tax years 2020 and 2021. The wife was assigned liabilities of $5,032.91. This distribution of the parties' liabilities left the wife with approximately fifty-nine percent of the parties' marital estate, and the husband with forty-one percent.[13] The judge did not address the resulting deviation from the division of the marital estate that he had found to be "most equitable."

After the judgment entered, the husband timely appealed, and we transferred the case to this court on our own motion.

3. Discussion. a. Alimony. "Alimony" is defined in the Alimony Reform Act of 2011, St. 2011, c. 124 (act), as "the payment of support from a spouse, who has the ability to pay, to a spouse in need of support for a reasonable length of time, under a court order." G. L. c. 208, § 48. The power to award alimony is governed by the alimony statute. See G. L. c. 208, § 53. See also Zaleski v. Zaleski, 469 Mass. 230, 233 (2014), quoting Gottsegen v. Gottsegen, 397 Mass. 617, 621-624 (1986) (power to award alimony is "wholly statutory"). The statute provides:

---

[13] Applying the figures supplied by the wife in her financial statement, the division skews slightly more in favor of the wife.

> "In determining the appropriate form of alimony and in setting the amount and duration of support, <u>a court shall consider</u>: the length of the marriage; age of the parties; health of the parties; income, employment and employability of both parties, including employability through reasonable diligence and additional training, if necessary; economic and non-economic contribution of both parties to the marriage; <u>marital lifestyle; ability of each party to maintain the marital lifestyle</u>; lost economic opportunity as a result of the marriage; and such other factors as the court considers relevant and material" (emphases added).

G. L. c. 208, § 53 (<u>a</u>).

i. <u>Saving</u>. The husband first contends that the judge improperly considered the parties' custom of allocating a significant portion of income as savings in setting the amount of spousal support payable to the wife.[14] The husband's challenge to the spousal support order raises a question of statutory construction, which we review de novo. See <u>Cavanagh</u> v. <u>Cavanagh</u>, 490 Mass. 398, 405 (2022).

---

[14] We have not had occasion previously to address the question whether saving, when it is a regular practice during the marriage, may be considered in determining the amount of spousal support. Contrary to the husband's contention, the Appeals Court did not address the issue in <u>Cooper</u> v. <u>Cooper</u>, 62 Mass. App. Ct. 130 (2004). <u>Cooper</u> concerned the propriety of an order modifying alimony based on the wife's postdivorce lifestyle rather than on the need to maintain the marital lifestyle. <u>Id</u>. at 140. Because the judge did not apply the appropriate material change in circumstances standard for revising alimony awards, among other errors, the Appeals Court remanded the matter. See <u>id</u>. The husband's reliance on <u>A.M.</u> v. <u>R.M.</u>, 95 Mass. App. Ct. 1120 (2019), similarly is misplaced.

Our analysis begins with the alimony statute's plain language.  See Metcalf v. BSC Group, Inc., 492 Mass. 676, 681 (2023).

> "[A] statute must be interpreted according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated" (citation omitted).

Harvard Crimson, Inc. v. President & Fellows of Harvard College, 445 Mass. 745, 749 (2006).  "Ordinarily, where the language of a statute is plain and unambiguous, it is conclusive as to legislative intent."  Sharris v. Commonwealth, 480 Mass. 586, 594 (2018), quoting Thurdin v. SEI Boston, LLC, 452 Mass. 436, 444 (2008).[15]  We "look to the statutory scheme as a whole, so as to produce an internal consistency within the statute" (quotations and citations omitted).  Plymouth Retirement Bd. v. Contributory Retirement Appeal Bd., 483 Mass. 600, 605 (2019).

A.  Marital lifestyle.  As set forth supra, the alimony statute enumerates certain factors, including the parties' "marital lifestyle" and the "ability of each party to maintain the marital lifestyle," that the judge must consider in

---

[15] "Where the statutory language is not conclusive, we may 'turn to extrinsic sources, including the legislative history and other statutes, for assistance in our interpretation.'" HSBC Bank USA, N.A. v. Morris, 490 Mass. 322, 332-333 (2022), quoting Chandler v. County Comm'rs of Nantucket County, 437 Mass. 430, 435 (2002).

determining alimony.  G. L. c. 208, § 53 (a).  The wife maintains that, because the parties' custom of saving underlay the parties' standard of living, the judge appropriately considered saving in connection with his mandatory consideration of the parties' "marital lifestyle."  We agree.

The plain meaning of "marital lifestyle" is the characteristic manner in which the couple chose to live their life during the marriage.  See Young v. Young, 478 Mass. 1, 6 (2017), quoting Inker, Alimony and Assignment of Property: The New Statutory Scheme in Massachusetts, 10 Suffolk U. L. Rev. 1, 8 (1975) (marital lifestyle pertains to "the manner of living to which [the spouses have] been accustomed," and term "focus[es] on the spouses' lifestyle during the marriage"); Oxford English Dictionary, https://www.oed.com/dictionary/lifestyle_n?tab =meaning_and_use#39115718 (defining "lifestyle" as "[a] style or way of living"; "characteristic manner in which a person lives [or chooses to live] [one's] life"); Oxford English Dictionary, https://www.oed.com/dictionary/marital_adj?tab=meaning_and_use#3 8088113 (defining "marital" as "[o]f or relating to marriage, or the relations between [spouses]").

As it regards the couple's financial decisions, "marital lifestyle" includes the typical way the parties regularly allocated their income during the marriage; to be considered the marital lifestyle, such allocations must be so customary as to

identify the parties' financial decision-making during the marriage.  See Oxford English Dictionary, https://www.oed.com/dictionary/characteristic_n?tab=meaning_and_use#9590365 (defining "characteristic" as something "[t]hat serves to identify or to indicate the essential quality or nature of a person or thing; distinctive; typical").  Accord Rhew v. Rhew, 138 N.C. App. 467, 473 (2000) ("the trial court can properly consider the parties' custom of making regular additions to savings plans as a part of their standard of living in determining the amount and duration of an alimony award" where "[e]vidence was presented that established an historical pattern of such contributions" [citation omitted]); Bakanowski v. Bakanowski, 2003 UT App 357, ¶ 16 (inclusion of saving as part of needs analysis permissible where contribution to savings accounts "was standard practice during the marriage and helped to form the couple's marital standard of living").

Thus, the plain meaning of the alimony statute's directive that the judge must consider the "marital lifestyle" and the "ability of each party to maintain the marital lifestyle" requires consideration of saving where the evidentiary record shows it was a regular practice during the marriage.  G. L. c. 208, § 53 (a).  These statutory terms encompass not just consumption spending on goods and services, but also the

deliberate choice during the marriage to devote income to savings regularly.

B. <u>Need</u>. This construction of "marital lifestyle" as permitting the consideration of the couple's pattern of contributions toward savings is buttressed by G. L. c. 208, § 53 (<u>b</u>), which provides in relevant part: "the amount of alimony should generally not exceed the recipient's need."[16] The term "need" is not defined; however, in view of the alimony statute's enumerated factors, we have stated that

> "the need for support of the recipient spouse (here, the wife) under general term alimony[17] is <u>the amount required to enable her to maintain the standard of living she had at the time of the separation leading to the divorce</u>" (emphasis added).

---

[16] General Laws c. 208, § 53 (<u>b</u>), provides in full:

"Except for reimbursement alimony or circumstances warranting deviation for other forms of alimony, the amount of alimony should generally not exceed the recipient's need or 30 to 35 per cent of the difference between the parties' gross incomes established at the time of the order being issued. Subject to subsection (<u>c</u>), income shall be defined as set forth in the Massachusetts child support guidelines."

The husband does not challenge the spousal support order on the ground that it exceeds the "presumptive parameters" that the amount should not exceed from thirty to thirty-five per cent of the parties' income differential. See <u>Young</u>, 478 Mass. at 6.

[17] The present case concerns general term alimony, in light of the length of the marriage. See G. L. c. 208, § 48.

Young, 478 Mass. at 2-3.  Where the parties' combined income is adequate to allow both spouses to maintain the standard of living enjoyed during marriage, "the recipient spouse's need for support is generally the amount needed to allow that spouse to maintain the [marital] lifestyle he or she enjoyed prior to termination of the marriage."[18]  Id. at 6, quoting Pierce v. Pierce, 455 Mass. 286, 296 (2009).  See 1 Lindey and Parley on Separation Agreements and Antenuptial Contracts § 22.63[2][e] (2d ed. 2023) ("standard of living experienced during the several years before the divorce" relevant for alimony determination is preseparation standard of living); L.D. Wardle & L.C. Nolan, Fundamental Principles of Family Law 715 (2d ed. 2006) ("the historic base line for measuring need has been the standard of living the parties enjoyed during the marriage").

Thus, where the parties have a combined income sufficient to permit both spouses to maintain the marital standard of living, the statute's limitation that the amount of alimony generally should not exceed the recipient spouse's need for support depends on the parties' marital lifestyle.  In other

---

[18] By contrast, "[w]here, as so often happens, the couple's collective income is inadequate to allow both spouses to maintain the lifestyle they enjoyed during the marriage after their household is divided in two through divorce, 'the recipient spouse "does not have an absolute right to live a lifestyle to which he or she has been accustomed in a marriage to the detriment of the provider spouse."'"  Young, 478 Mass. at 7, quoting Pierce v. Pierce, 455 Mass. 286, 296 (2009).

words, "'need' is a relative term for purposes of the act, [and] it must be measured in light of mandatory considerations that include the parties' marital lifestyle." Zaleski, 469 Mass. at 243.  See Young, 478 Mass. at 7 ("the parties' needs expanded in accordance with the increasingly available income during the marriage" [quotation omitted]).

For example, where the parties' marital lifestyle at the time of their separation included lavish spending on luxuries, such as expensive vacations, high-end vehicles, art collections, and recreational boats, such discretionary spending is material to determining the amount of spousal support.  See, e.g., Young, 478 Mass. at 4 (considering spousal support judgment in view of parties' lavish lifestyle during marriage, which included owning extravagant principal residence, maintaining Nantucket summer home, driving luxury vehicles, regularly dining out, enjoying expensive vacations, and purchasing luxury goods); D.L. v. G.L., 61 Mass. App. Ct. 488, 490 (2004) (factoring in spending on "the finest furniture, rugs, china, and jewelry," extensive travel, frequent entertaining, and membership in private social clubs, among other luxuries).  Thus, the couple's customary financial decisions during the marriage regularly to allocate income for savings, no less than their consumption spending, must be considered where it characterized the parties' marital lifestyle and defined their standard of living.

Where the family budget during the marriage is characterized by regular saving, fewer resources necessarily are available for pure consumption spending.  If, as the husband maintains, alimony strictly is measured by the marital level of consumption on goods and services, then the recipient spouse either must reduce that level of consumption in order to continue the pattern of saving that characterized the marital lifestyle or must abandon the practice altogether.  See, e.g., In re Marriage of Drapeau, 93 Cal. App. 4th 1086, 1096 (2001) (Drapeau) (purpose of couple's saving was to retire early, goal which payor spouse could achieve but payee spouse could not without savings alimony); Vadala v. Vadala, 145 N.C. App. 478, 479 (2001) (without savings alimony spouse "will be forced to work much longer than she would have, had she continued to enjoy the standard of living to which she had become accustomed during her marriage, since she is unable to accumulate savings of an amount that would allow her to retire").  Such a construction would frustrate the alimony statute's purpose of maintaining each spouse's marital lifestyle where the parties' postdissolution income makes that outcome possible.

Because it is the manner in which a couple consistently allocated marital income -- not just how they spent it on day-to-day expenses and luxuries -- that determines their standard of living during the marriage, nothing in the limitation that

the alimony award generally must not exceed the recipient spouse's "need," see G. L. c. 208, § 53 (b), precludes a judge from considering the parties' regular practices of saving. "[T]here is no demonstrable difference between one family's habitual use of its income to fund savings and another family's use of its income to regularly purchase luxury cars or enjoy extravagant vacations." Lombardi v. Lombardi, 447 N.J. Super. 26, 39 (App. Div. 2016). "[I]t would be a perverse state of the law if we, as a rule, always included in an alimony calculation all sums parties spent, even imprudently, but excluded sums wisely saved." Mintz v. Mintz, 2023 UT App. 17, ¶ 26. It would in effect "penalize those who are prudent enough to save during marriage." Drapeau, 93 Cal. App. 4th at 1096.

C. Division of marital estate. The husband contends that a couple's habit of saving cannot be considered in setting the amount of alimony because it is already subsumed in the marital estate in the form of assets; as such, the husband argues, saving already is considered in connection with the division of the marital estate under G. L. c. 208, § 34.[19] That provision

---

[19] General Laws c. 208, § 34, provides in part:

"In addition to or in lieu of a judgment to pay alimony, the court may assign to either husband or wife all or any part of the estate of the other, including but not limited to, . . . funds accrued during the marriage and which shall include, but not be limited to, retirement benefits, military retirement benefits if qualified under and to the

enumerates "the opportunity of each [party] for future acquisition of capital assets and income" as one factor that the judge must weigh in equitably distributing the parties' marital property.  The husband argues that this factor therefore precludes the judge from considering the parties' habit of saving portions of their income during the marriage as an element of the parties' "marital lifestyle" under the alimony statute.

Of course, the division of marital property pursuant to G. L. c. 208, § 34, and the provision of alimony pursuant to § 53, are to be considered in relation to each other.  See D.L., 61 Mass. App. Ct. at 508 ("alimony and property division . . . are interrelated remedies that cannot be viewed apart").  Both alimony, under § 53, and the division of the marital estate, under § 34, are committed to the sound discretion of the trial judge to balance equitably, and the judge may adjust the award of each in relation to the other.  See id.

---

extent provided by [F]ederal law, pension, profit-sharing, annuity, deferred compensation and insurance.  In fixing the nature and value of the property, if any, to be so assigned, the court . . . shall consider the length of the marriage, the conduct of the parties during the marriage, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties, the opportunity of each for future acquisition of capital assets and income, and the amount and duration of alimony, if any, awarded under [G. L. c. 208, §§] 48 to 55, inclusive" (emphasis added).

While the husband is correct that the judge must ensure that the financial arrangement is fair "as a whole," Hassey v. Hassey, 85 Mass. App. Ct. 518, 523 n.12 (2014), quoting Grubert v. Grubert, 20 Mass. App. Ct. 811, 822 (1985), nothing in § 34 precludes consideration of the parties' custom of allocating substantial portions of their income to savings as part of the "marital lifestyle" under § 53. To be sure, an equitable distribution of the marital estate ensures that both parties reap the benefits of regular saving during the marriage in the form of the marital assets. However, where, as here, the parties' postdissolution income is sufficient for each party to continue to live the marital lifestyle, if routine saving is not considered in connection with the determination of alimony, the recipient spouse will be forced to rely on the appreciation of current assets while the payor spouse will be able to continue the full extent of the marital lifestyle, including regular saving. See Lombardi, 447 N.J. Super. at 40 ("it is not equitable to require [the wife] to rely solely on the assets she received through equitable distribution to support the standard of living while [the husband] is not confronted with the same burden").

Accordingly, we conclude that where, as here, a married couple has an established practice of saving during the marriage, a judge properly may consider such saving as a

component of the couple's marital lifestyle in awarding alimony. In doing so, we join the vast majority of jurisdictions to have considered the issue.[20]  We realize that not everyone's resources

---

[20] See In re Marriage of Weibel, 965 P.2d 126, 129-130 (Colo. App. 1998) ("an appropriate rate of savings . . . can, and in an appropriate case should, be considered as a living expense when considering an award of, or reduction in, maintenance"); In re Marriage of Stenzel, 908 N.W.2d 524, 536 (Iowa Ct. App. 2018) ("retirement savings in a reasonable sum may be a part of the needs analysis in fixing spousal support"); Lombardi, 447 N.J. Super. at 29-30 ("regular savings must be considered in a determination of alimony"); Rhew, 138 N.C. App. at 473 (trial judge should have considered "savings made in accordance with a pre-existing pattern in determining defendant's accustomed standard of living");  LaVoi v. LaVoi, 505 N.W.2d 384, 387 (N.D. 1993) (upholding lower court's spousal support award, which afforded wife "a modest opportunity to plan some retirement savings"); Bakanowski, 2003 UT App 357, ¶ 16 ("The critical question is whether funds for post-divorce savings, investment, and retirement accounts are necessary because contributing to such accounts was standard practice during the marriage and helped to form the couple's marital standard of living"); Miller v. Cox, 44 Va. App. 674, 686 (2005) (consideration of savings during marriage allows payee spouse to "continue to save money and invest it in a manner to which she was accustomed during the marriage"); Hubert v. Hubert,  159 Wis. 2d 803, 820 (Ct. App. 1990) (trial judge erred by not "set[ting] maintenance at a level that would permit [the wife] to continue saving and investing," thereby failing "to maintain a standard of living reasonably comparable to that which she enjoyed before the divorce").  See also Rainwater v. Rainwater, 177 Ariz. 500, 505 (Ct. App. 1993) ("[H]usband objects that wife's expenses were overstated by the amount of $337.60 for monthly savings and retirement contributions.  Husband, however, has cited no authority for the proposition that this is an illegitimate expense item"); Drapeau, 93 Cal. App. 4th at 1098 ("trial court should have considered the parties' practice of savings as an element in their [marital standard of living]"). But see Mallard v. Mallard, 771 So. 2d 1138, 1140-1141 (Fla. 2000) (rejecting savings alimony); Kuroda v. Kuroda, 87 Haw. 419, 429-430 (Ct. App. 1998) (same).

permit such saving during the marriage, and that in many cases the parties' financial circumstances after dissolution may require that the standard of living enjoyed during the marriage be curtailed. In the circumstances presented here, however, as the couple's combined postdissolution income is adequate to allow both spouses to maintain the marital standard of living, the judge properly considered the parties' practice of saving as an element of their marital lifestyle.

ii. _Financial support for wife's expenses_. The husband also challenges the judge's decision to credit the wife's financial statement disclosing her expenses at the time of trial and to base the alimony award on her current reported spending rather than on the husband's accounting of the household's spending in the three years prior to the couple's separation.

In determining whether to award spousal support, and the amount thereof, under G. L. c. 208, § 53, a trial judge enjoys "broad discretion." _Young_, 478 Mass. at 5-6, quoting _Zaleski_, 469 Mass. at 235. Such an award "will not be disturbed on appeal unless plainly wrong and excessive" (quotation omitted). _Zaleski_, _supra_ at 236, quoting _Heins_ v. _Ledis_, 422 Mass. 477, 481 (1996). See _Cavanagh_, 490 Mass. at 405 (on appeal, our review is only for abuse of discretion). Instead, we confine our review to determining whether the judge's factual findings that the parties challenge on appeal are clearly erroneous,

whether the judge considered the required statutory factors, whether the judge relied on any irrelevant factors, and whether the reasons for the judge's conclusions are "apparent" from the judge's findings.  Zaleski, supra at 235-236.

The husband is correct that the proper measure of the recipient's need for support is "the marital lifestyle the parties enjoyed during the marriage, as established by the judge at the time of the order being issued."  Young, 478 Mass. at 7. However, the crux of the husband's claim is not that the judge neglected this instruction; instead, his argument is that the judge credited the wrong evidence in determining the wife's need.  Such determinations fall squarely within the judge's broad discretion.  See id. at 5.

In financial filings, the husband represented that, excluding taxes and tithing, the family spent $193,203 in 2015, $146,241 in 2016, and $158,293 in 2017 (the three full years preceding separation).[21]  The judge found, however, that the husband's accounting failed "to recognize that a significant aspect of the parties' marital lifestyle was saving."

---

[21] As the wife aptly notes, the husband failed to include the bases for these calculations in the record on appeal.  "The burden is on the appellant to ensure that an adequate record exists for an appellate court to evaluate."  Commonwealth v. Woods, 419 Mass. 366, 371 (1995).  Accordingly, there is no record basis to assess the husband's assertions as to the household's expenses for these years.

Accordingly, the judge did not use the husband's reported figures to determine the amount of alimony.

The judge further considered the husband's report of the wife's spending following their separation. Specifically, the husband calculated that the wife spent $79,704.09 in 2018, $92,623.78 in 2019, and $224,144.64 in 2020. The judge found, however, that the wife's spending in these years was limited by the amount of support she received. Accordingly, he also declined to use these figures in calculating the alimony award. This determination that the wife's artificially constrained spending from 2018 through 2020 was not a reliable proxy for the marital lifestyle is well founded.

The judge instead credited portions of the wife's current financial statement as the best available record of the amount needed to maintain her marital lifestyle. He did not accept the wife's report blindly; he scrutinized the financial statement, crediting some expenses but excluding others to determine the wife's need for support.[22] The judge's decision to credit this evidence followed a four-day trial, which included oral testimony and exhibits setting forth both parties' financial

---

[22] Specifically, the wife reported a combined child support and alimony need of $7,754.97 per week. The judge subtracted the wife's "anticipated expenses and accountant fees" and added a weekly housing expense (because of the expected sale of the marital home), as well as a weekly medical insurance expense.

submissions.  On this record, we cannot say that the judge erred in relying on financial statements filed shortly before trial to evaluate need based on the parties' lifestyle during the marriage.[23]  See generally Massachusetts Divorce Law Practice Manual § 6.4 (Mass. Cont. Legal Educ. 4th ed. 2019 & Supp. 2021) ("The financial statement . . . provides information relevant to the factors that must be considered when determining the appropriate form, amount, and duration of alimony. . . .  As an exhibit, the statement can take the place of the attorney orally asking all the questions on the statement and receiving oral answers").[24]

---

[23] Notably, the wife's financial statements showed expenses far below the husband's own average weekly spending of approximately $14,000 during the period between separation and trial, even though the wife lived with and cared for their minor child while the husband lived alone in an undisclosed location in Florida for much of the separation period.

[24] See also Young, 478 Mass. at 3-5 (in divorce action initiated in January 2013, trial judge evaluated, but ultimately did not credit fully, financial statements filed in October 2013 and September 2014 in assessing alimony amount for judgment issued in September 2015); C.D.L. v. M.M.L., 72 Mass. App. Ct. 146, 152 (2008) (trial judge determined wife's needs by beginning with wife's "most recent financial statement"); Rule 401 of the Supplemental Rules of the Probate and Family Court (2012) (parties are required to submit financial statements showing, inter alia, "current income and expenses" within forty-five days of service of summons, and judge "may require . . . during the pendency of a . . . divorce action . . . a new financial statement containing current information"); Uniform Probate Court Practice XXX (1982) ("No complaint for divorce . . . shall be marked for a hearing unless a financial statement of each party is on file with the court").  Cf. D.B. v. J.B., 97 Mass. App. Ct. 170, 177 (2020) ("although the judge was unable

Moreover, where the family earned approximately $1.3 million per year in 2016 and 2017, and the husband's postseparation expenses exceeded what he claimed the entire family spent preseparation -- despite the wife retaining primary responsibility for the unemancipated children -- we see no error in the judge's decision to discredit the husband's assertion that the needs of the marital lifestyle required only ten to fifteen percent of the household income. The judge acted within his discretion in determining that the evidence submitted by the wife reflected a valid assessment of the marital lifestyle.

The husband's challenge to the evidentiary basis for the wife's saving also fails. Evidence elicited at trial supports a conclusion that the parties' marital lifestyle included a pattern and practice of saving.[25] Because we conclude that a

---

to determine the wife's 'true need' based on her financial statement, given the discretion afforded by the act, it was permissible for her instead [or in addition] to consider the various mandatory and discretionary factors as prescribed by [G. L. c. 208, § 53 (a),] to fashion an alimony award that would be appropriate in providing the wife the means to maintain the marital lifestyle").

[25] The couple's income in 2016 and 2017, the two full years preceding the parties' separation, exceeded $1.3 million per year. According to the husband's figures, the couple spent only $146,241 in 2016 and $158,293 in 2017 (and donated an additional $131,039 and $172,167 in each year, respectively). The husband testified that he tried to "keep as little amount of cash as possible in cash accounts"; he would "look out over the next month or two or three and try to estimate what those expenses are going to be and . . . try to budget for those with cash," and when he had additional cash he would "try to get that into

judge may consider a marital practice of saving in determining a recipient spouse's need, and the record supports such a routine practice here, the judge did not abuse his discretion by factoring the parties' marital practice of saving into the alimony award.[26]

Finally, the judgment, findings, and rationale of the judge reflect that he considered and weighed each of the mandatory factors required by G. L. c. 208, § 53 (a).  Therefore, we conclude that the trial judge did not abuse his discretion in connection with the amount of weekly spousal support.

b.  Division of liabilities.  The husband also challenges the judge's division of the parties' liabilities.  The power to make an equitable division of the marital estate is entrusted to the judge's discretion, and we review the decision to ensure the judge properly relied on the statutory factors enumerated in G. L. c. 208, § 34.  Adams v. Adams, 459 Mass. 361, 371 (2011), S.C., 466 Mass. 1015 (2013).  We must determine "whether the reasons for the judge's conclusions are apparent in his findings

one of the securities investment accounts."  The wife identified particular accounts that were used for savings, investments, and retirement funds.  Financial statements identifying these accounts, along with their values, were included in the record.  The evidence more than supported the wife's reported amount of weekly saving.

[26] The husband misstates that the wife conceded that the husband's calculations were accurate.

and rulings" (quotation and citation omitted). Id. The judge's decision as to equitable distribution is subject to reversal only if the division was "plainly wrong and excessive." Zaleski, 469 Mass. at 245, quoting Baccanti v. Morton, 434 Mass. 787, 793 (2001).

In dividing the marital estate, exact "[m]athematical precision is not required." Ross v. Ross, 50 Mass. App. Ct. 77, 81 (2000), quoting Fechtor v. Fechtor, 26 Mass. App. Ct. 859, 861 (1989) (accepting trial judge's approximate valuation of marital estate). However, "[i]t is the duty of the reviewing court to consider whether the apportionment of assets flows rationally from the judge's findings under § 34." Calvin C. v. Amelia A., 99 Mass. App. Ct. 714, 727 (2021), quoting Casey v. Casey, 79 Mass. App. Ct. 623, 629 (2011) (reversing judgment where judge ordered equal division of marital estate equity but assigned obligation to repay one shared liability solely to husband, substantially reducing his share of estate equity). See Martin v. Martin, 29 Mass. App. Ct. 921, 921 (1990) (findings must "lead logically to" result).

Here, the judge concluded that "a division of the marital estate with [the w]ife receiving approximately [fifty-five percent] and [the h]usband receiving approximately [forty-five percent] is most equitable." Accordingly, the judge awarded

fifty-five percent of the marital assets to the wife and forty-five percent to the husband.

With regard to marital liabilities, however, the judge assigned to each spouse the liabilities listed in his and her own name, resulting in the wife being responsible for just $5,032 in liabilities, and the husband $343,280, or 98.6 percent of the total marital debts. While the liabilities assigned to the wife consisted solely of credit card bills, all but $280 of the liabilities assigned to the husband were for the family's unpaid tax debt incurred in 2020 and 2021. This assignment of liabilities skewed the net division of the marital estate to a split of approximately fifty-nine percent to forty-one percent.[27] The record does not reveal the rationale for this deviation of over $300,000 from the judge's stated intent to divide the marital estate with fifty-five percent to the wife and forty-five percent to the husband. See Calvin C., 99 Mass. App. Ct. at 727; Martin, 29 Mass. App. Ct. at 921. Moreover, the judge did not articulate any reason why these liabilities, which consisted primarily of the family's tax debt, should be assigned

---

[27] The wife notes that the judge's stated goal was to divide the marital estate between the parties "approximately" fifty-five percent to forty-five percent, rather than to divide the estate "exactly" in that manner, and that therefore the assignment of liabilities was not inconsistent with the judge's determination. But, here, the extent of the deviation is substantial and unexplained.

solely to the husband, aside from noting that the wife "acted within her right to file [taxes] separately."  While the wife very well may have been entitled to file separately, that right does not bear on the equitable division of the tax debt, the primary marital liability.  Accordingly, we conclude that the division of liabilities was erroneous.[28]

4.  <u>Conclusion</u>.  So much of the judgment of the Probate and Family Court as addressed the division of liabilities is vacated; the judgment is otherwise affirmed, and the matter is remanded for further proceedings consistent with this opinion.

<u>So ordered</u>.

---

[28] As discussed <u>supra</u>, the judge addressed not only the financial obligations of the parties going forward, but also the contested legal and physical custody of their youngest child. In determining custody, parental conduct may be an appropriate consideration.  See, e.g., <u>Hunter</u> v. <u>Rose</u>, 463 Mass. 488, 494-495 (2012) ("Factors a judge may weigh are whether one parent's home is more stable in terms of a parent's work schedule, whether siblings are being raised together, and whether one parent seeks to undermine the relationship a child has with the other parent").  Moreover, "conduct having an adverse impact on the marriage or the marital estate" is, in limited circumstances, a valid consideration in determining the equitable division of property.  <u>Kittredge</u> v. <u>Kittredge</u>, 441 Mass. 28, 38 (2004).  Contrary to the husband's contention, nothing in the judgment indicates that the judge improperly relied on the husband's "blameworthy conduct" in dividing the marital estate.  <u>Putnam</u> v. <u>Putnam</u>, 5 Mass. App. Ct. 10, 15-16 (1977).